**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 14 2012, 9:23 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CYNTHIA PHILLIPS SMITH**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**CRAIG JONES**
DCS Tippecanoe County Office
Lafayette, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) | |
| | ) | |
| | ) | |
| B.T. (Minor Child) | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| J. T. (Mother), | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 79A02-1107-JT-665 |
| | ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta Rush, Judge
The Honorable Faith Graham, Magistrate
Cause No. 79D03-1104-JT-29

**February 14, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, J.T. (Mother), appeals the trial court's termination of her parental rights to her minor child, B.T.[1]

We affirm.

ISSUES

Mother raises three issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the State presented sufficient evidence to conclude that the conditions

that led to B.T.'s removal from the home would not be remedied; and

(2) Whether termination of Mother's parental rights was in B.T.'s best interests.

FACTS AND PROCEDURAL HISTORY

Mother and Father have been married since February 14, 2008 and are the parents

of B.T., born January 31, 2010. Mother, Father, and B.T. were living with Mother's

---

[1] Although the trial court also terminated Father's parental rights to B.T., he is not a party to this appeal.

parents on May 20, 2010, when the Indiana Department of Child Services (DCS) received a report that their residence was not clean. On May 21, 2010, DCS Family Case Manager Paige Heath (FCM Heath) assessed the residence and found that it was below minimum standards. She requested that the family clean it and gave them the weekend to do so. On May 25, 2010, FCM Heath returned and found that the family had cleaned the main living area of the home, the kitchen, and the dining area, but that Mother and Father's room still had many safety concerns for a young child, such as wires lying on the floor and wobbly bookcases.

That same week, on May 26, 2010, DCS became aware of a report of domestic violence between the parents. The report stated that on May 24, 2010, Father had choked Mother and thrown her to the ground in their residence. According to the report, Father had left the residence after choking Mother and prior to the arrival of law enforcement, but had commented before he left that he would shoot the next officer that stopped him. As a result of this altercation, Mother spent the night in a domestic violence shelter. The next night, she moved to Father's parents' house to live there with Father and B.T.

On May 31, 2010, DCS received another report, indicating that Mother had recanted her statement concerning the May 24 domestic violence. Mother's revised story was that an argument had occurred, but that there had not been any violence between her and Father. Instead, she alleged that her sister had run into the bedroom during the argument, choked Mother, and hit B.T.'s head on a dresser. Mother explained that she had lied about the domestic violence out of anger towards Father. She also told law

3

enforcement that B.T. had been acting listless and had not been sleeping well since hitting her head on the dresser. Law enforcement dispatched an ambulance to the parents' home and transferred B.T. to the emergency room, where doctors found her to be alert and responsive, without any observable marks or injuries.

On June 3, 2010, DCS investigators visited Mother and Father at Father's parents' apartment and found that the apartment was cluttered with many of the same items that had cluttered their previous residence. During the visit, Mother responded to questions about the May 24 domestic incident, as well as a previous incident in 2008 in which law enforcement had been dispatched to Mother and Father's residence in response to a domestic violence complaint. Mother denied that there had been any domestic violence in the 2008 incident and told DCS that the investigating officer had forced Mother, as well as Father's daughter from a previous marriage, to make false statements implicating Father in domestic violence.

After this investigation, DCS took custody of B.T. and filed a petition alleging that B.T. was a child in need of services (CHINS). On July 27, 2010, the trial court held a factfinding hearing on the petition and on July 29, 2010, the trial court found B.T. to be a CHINS. On August 17, 2010, the trial court entered a parental participation decree, in which it ordered Mother and Father to participate in parent/bonding assessments, psychological assessments, home-based case management services, visitation, couples counseling as recommended by a therapist, and anger management courses, among other services.

4

Pursuant to the trial court's Order, Mother and Father underwent psychological evaluations. Doctors Theresa Slayton (Dr. Slayton) and Jeff Vanderwater-Piercy (Dr. Vanderwater-Piercy) examined Father and concluded that he "present[ed] with a psychotic disorder marked by delusional beliefs of a persecutory and somewhat grandiose nature. There also appear[ed] to be a history of recurring depression and mania/hypomania. The clinical picture [was] further complicated by social anxiety, panic attacks, attention-deficits, and hyperactivity." (Petitioner's Exh. 6). As a result of this diagnosis, Doctors Slayton and Vanderwater-Piercy found that Father was a "very poor candidate for any significant behavior change." (Petitioner's Exh. 6). Doctors Slayton and Vanderwater-Piercy also examined Mother and found that she suffered from post-traumatic stress resulting from abuse by her father in her childhood, as well as anxiety and stress-related seizures. The Doctors recommended that Mother and Father engage in marital therapy in order to improve their conflict resolution skills and to monitor for domestic violence.

As part of their court-ordered services, Mother and Father worked with Stacia Schluttenhofer (Schluttenhofer), a home-based family specialist, who handled the parents' visitations with B.T. During their meetings with Schluttenhofer, Mother and Father initially denied any allegations of domestic violence. However, on October 21, 2010, Mother and Father disclosed two years of domestic violence to Schluttenhofer and admitted that they had been involved in a physical altercation earlier that day. Mother and Father also disclosed that on October 10, 2010, Father had slapped Mother for

spending time with someone in their apartment complex that he did not approve of. Mother showed Schluttenhofer a picture of her cheek that she had allegedly taken on October 10. Schluttenhofer noticed that in the picture Mother's cheek was red. As a result of this conversation, Schluttenhofer took Mother to a domestic violence shelter after she returned B.T. to her foster placement that day. Father also approached Schluttenhofer and asked her what services were provided to male victims of domestic violence, but Schluttenhofer did not have an answer for him and advised him to contact law enforcement for resources.

Schluttenhofer later learned that Mother left the domestic violence shelter within two days in order to return to Father. Also, within one week of their disclosures to Schluttenhofer, both Mother and Father recanted their stories. Schluttenhofer continued to work with Mother, but Mother frequently cancelled her appointments or failed to show up. Starting in December 2010, Mother ceased requesting any case management, and her last session with Schluttenhofer was in January 2011. According to Schluttenhofer, Mother still has unresolved issues with domestic violence.

Case Manager Julie Williams initially provided case management services in B.T.'s case and also discussed domestic violence concerns with Mother. When Father was not present during one meeting, Mother disclosed that there had been domestic violence in their household but that she "initially said it happened and then got scared and retracted her statement, but that it did happen." (Transcript p. 124). Later, when the parents were together, they were both adamant that they had not been violent towards

6

each other. Williams subsequently attempted to arrange anger management counseling for Mother and Father. Mother completed the program, but Father refused to sign the consent forms and never participated.

Mother and Father also had several incidents with respect to their visitations with B.T. According to Williams, "they were constantly late," and Father completely missed many case management sessions. As a result, the decision was made in August of 2010 to discharge Mother and Father from services.

In August of 2010, DCS family case manager, Kristin Meadows (FCM Meadows), became the case manager for B.T.'s case. She referred Mother to a domestic violence program at a YWCA, but Mother failed to complete the program. Meadows also met with Mother and Father and discussed domestic violence. Both parents denied that there was any violence in their relationship and told Meadows that they did not even fight or argue. Under Meadows' direction, Father participated in one session of Non-Violent Alternatives, a counseling program intended to address relationship conflict. However, he failed to return.

In her visitation reports, Meadows noted that she was concerned by Father's interactions with B.T. Namely, Father frequently played inappropriate music and did not communicate or interact with B.T. in a way that was age-appropriate. He also let B.T. play with items that were not toys and that could pose a safety risk for B.T. According to Meadows, Father had an inability to remain focused on B.T. during an entire visit. In one of her reports, Meadows wrote: "Every visit [Father] brings in several bags with a

laptop, speakers, and other equipment that is not needed during the visit. He often sets these devices up first before attending and visiting with [B.T.]. On almost every visit log the concern is [Father] being distracted with his gadgets." (Petitioner's Exh. 3).

On April 14, 2011, DCS filed a petition to terminate their parental rights to B.T., alleging that there was a reasonable probability that the conditions that led to B.T.'s removal would not be remedied. On May 26, 2011, the trial court held a hearing on the petition and on June 21, 2011, the trial court terminated Mother and Father's parental rights.

Mother now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

On appeal, Mother argues that the evidence was insufficient to support the termination of her parental rights to her minor child, B.T., because DCS did not prove that the conditions that led to B.T.'s removal from the home would not be remedied. In support of this contention, she argues that she had remedied many of the conditions that had concerned DCS when it filed its CHINS petition—she lived in a clean home, had full-time employment, and had completed therapy. In addition, she argues that the services DCS provided failed to address her special needs because even though DCS knew she had below average intellectual functioning and that she and Father had issues with domestic violence, DCS never provided any services to help her with either issue. Mother asserts that she could have remedied the conditions that led to B.T.'s removal if she had received the proper treatment.

8

We recognize that the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re J.S.O.,* 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. *Id.* However, the trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination of a parent-child relationship. *In re J.H.,* 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), *trans. denied.* Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id.*

In reviewing termination proceedings on appeal, this court must not reweigh the evidence nor assess the credibility of the witnesses. *Id.* We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id.* Where, as here, the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings, and second, whether the findings support the conclusions of law. *Id.* In deference to the trial court's position to assess the evidence, we set aside the trial court's findings and judgment terminating the parent-child relationship only if they are clearly erroneous. *Id.*

In order to terminate Mother's parental rights, DCS was required to prove by clear and convincing evidence:

(B) that one of the following [was] true:

(i) There [was] a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents [would] not be remedied.

(ii) There [was] a reasonable probability that the continuation of the parent-child relationship [posed] a threat to the well-being of the child.

(iii) The child [had], on two (2) separate occasions, been adjudicated [] in need of services[.]

(C) that termination [was] in the best interests of the child.

Ind. Code § 31-35-2-4(b)(2)(B), -(C); *Bester v. Lake Cnty. Office of Family and Children,*839 N.E.2d 143, 148 (Ind. 2005). Clear and convincing evidence as a standard of proof requires the existence of a fact to "be highly probable." *Hardy v. Hardy,* 910 N.E.2d 851, 859 (Ind. Ct. App. 2009). It need not reveal that "the continued custody of the parent[] is wholly inadequate for the child's very survival." *Bester,* 839 N.E.2d at 148 (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1233 (Ind. 1992)). Rather, it is sufficient to show that the child's emotional and physical development are threatened by the parent's custody. *Id.*

## I. *Remedy of Conditions*

Based on our review of the record, we cannot agree with Mother that there was insufficient evidence that the conditions that led to B.T.'s removal would not be remedied. When determining whether there is a reasonable probability that a parent will not remedy the conditions justifying a child's removal from the home, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing. *Rowlett v. Vanderburgh Cnty. Office of Family and Children,* 841 N.E.2d 615, 621 (Ind. Ct. App. 2006). The trial court must evaluate the parent's habitual patterns of conduct to

determine whether there is a substantial probability of future neglect or deprivation of the child. *C.T. v. Marion Cnty. Dept. of Child Services,* 896 N.E.2d 571, 578 (Ind. Ct. App. 2008), *trans. denied.* DCS is not required to rule out all possibilities of change; rather, it need only establish "that there is a reasonable probability that the parent's behavior will not change." *Id.* (quoting *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007)).

Here, the trial court found that:

16. Multiple services were provided to the parents over several months to address these instability, domestic violence, and mental health concerns. The services were modified to meet the special needs of the parents. Father's progress in services was minimal at best. Father required significant intervention and constant redirection during services and visitations. Mother displayed a greater ability to participate and make progress in services. However, Mother's participation in case management waned over the last three (3) months and her case management was ultimately discontinued to an "as-requested" basis due to lack of attendance. Mother has missed several visitations and/or case management sessions since September 2010. Although some minimal progress was made regarding financial and housing stability, the domestic violence and mental health concerns remain unresolved.

\*　　\*　　\*

18. Mother remains unable or unwilling to address the safety risks posed by Father. Father's lack of parenting skills requires Mother to assume most of the parenting responsibilities. During joint visits, Mother often encourages Father's negative behaviors and appears to agree with his choices. Father often ignores or refuses Mother's requests. Although Mother has basic parenting skills and made some progress in managing her anxiety, she made no meaningful progress regarding her domestic violence relationship with Father. Mother's therapist, case manager, and other service providers discussed with Mother the ramifications of remaining in a violent relationship with Father, especially given his mental health issues. Mother was introduced to services to assist single parents with financial concerns in separating from an abusive relationship. However, Mother never followed through with those services and chose to remain in the relationship. The parents have a dysfunctional relationship involving recurring domestic

violence. The parents have been unable or unwilling to successfully address their relationship issues in order to provide a plan to safely care for the child.

(Appellant's App. p. 12). Mother does not dispute these findings, other than to argue that the record is "replete with generalizations and not specific facts." (Appellant's Br. p. 9). We disagree and note that the record includes extensive reports regarding Mother's visitations, as well as psychological evaluations. Each of these documents contains precise facts supporting the trial court's findings. As Mother has not been more specific in her argument, we cannot address it in more detail, and we find that there was sufficient evidence to support the trial court's findings. In addition, we conclude that the trial court's determination that Mother and Father had not provided a plan to safely care for their child or address their issues with domestic violence in turn sufficiently supports the trial court's legal conclusion that there was a reasonable probability that the conditions that led to B.T.'s removal would not be remedied.

In response to Mother's second argument—that she was not provided with sufficient services—we note that "the provision of family services is not a requisite element of our parental rights termination statute. A failure to provide services, or the provision of services in an allegedly discriminatory manner, does not serve as a basis on which to directly attack a termination order as contrary to law." *In re E.E.,* 736 N.E.2d 791, 796 (Ind. Ct. App. 2000). As DCS was not required to provide services to Mother at all, we conclude that Mother's argument that she did not receive enough services does not have merit. Moreover, multiple service providers discussed the ramifications of

12

domestic violence with Mother. On two different occasions Mother spent the night at a domestic violence shelter only to return to Father within one or two days. Also, the trial court ordered Mother to complete a domestic violence education program at a YWCA, which she did not do. Based on Mother's lack of progress in confronting her issues with domestic violence, we conclude that the trial court did not err in finding that there was a reasonable probability that the conditions that led to B.T.'s removal would not be remedied.[2]

## II. *Best Interests of the Child*

Next, Mother argues that it was not in B.T.'s best interests for the trial court to terminate Mother's parental rights because she is clearly bonded with B.T. and loves her very much. In addition, Mother notes that she attended all of B.T.'s medical and dental appointments, participated in regular visitation with B.T., and had very positive interactions and visitations with B.T.

In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS to the totality of the evidence. *In re T.F.,* 743 N.E.2d 766, 776 (Ind. Ct. App. 2001). In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* In analyzing a child's best interests, we recognize that permanency is a central consideration. *In re G.Y.,* 904

---

[2] The State was only required to prove that the conditions that led to B.T.'s removal would not be remedied *or* that Mother was a threat to B.T.'s well-being. *See* Ind. Code § 31-35-2-4(b)(2)(B). As we have already addressed the issue of whether the conditions that led to B.T.'s removal will be remedied, we will not address the issue of whether Mother was a threat to B.T.'s well-being.

N.E.2d 1257, 1265 (Ind. 2009). The trial court need not wait until a child is irreversibly influenced such that their physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re T.F.,* 743 N.E.2d at 776.

We acknowledge that there is evidence in the record that Mother had very positive visitations with B.T. and was very bonded to B.T. However, we note that in spite of Mother's positive visitations and love for B.T., she has been unable to provide a safe environment for B.T. as she has not addressed the domestic violence between herself and Father. Accordingly, we find that the trial court did not err in concluding that termination of Mother's parental rights was in B.T.'s best interests.

## CONCLUSION

Based on the foregoing, we conclude that (1) the DCS provided sufficient evidence that the conditions that led to B.T.'s removal from the home would not be remedied; and (2) the trial court did not err in concluding that termination of Mother's parental rights to B.T., was in the minor child's best interests.

Affirmed.

FRIEDLANDER, J. and MATHIAS, J. concur

14