**In the Matter of the Termination of the Parent–Child Relationship of J.S.O., Minor Child.**

**S.O., Appellant–Respondent,**

**v.**

**Indiana Department of Child Services, Appellee–Petitioner.**

**No. 64A05–1005–JT–304.**

Court of Appeals of Indiana.

Dec. 7, 2010.

Bryan M. Truitt, Bertig & Associates, Valparaiso, IN, Attorney for Appellant.

John P. Shanahan, Indiana Department of Child Services, Valparaiso, IN, Robert J. Henke, DCS Central Administration, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Respondent, S.O. (Father), appeals the trial court's involuntary termination of his parental rights to his minor child, J.O.

We reverse.

### ISSUE

Father presents several issues for review, only one of which we find dispositive and which we restate as follows: Whether Father was denied procedural due process when the Indiana Department of Child Services, Porter County (PCDCS), failed to provide Father with notice of all hearings and copies of all orders and other documents issued during the child in need of services (CHINS) proceedings despite PCDCS's actual knowledge of Father's name and whereabouts.

### FACTS AND PROCEDURAL HISTORY

J.O. was born in Oklahoma in May 2008. At the time of J.O.'s birth, Father and J.O.'s biological mother, A.A. (Mother), had recently moved from Indiana to Oklahoma and were living together, but they were not married.[1] Father signed a paternity affidavit at the hospital in Oklahoma and was listed as J.O.'s father on the child's birth certificate. Shortly after J.O.'s birth, Father was arrested and extradited to Indiana on an outstanding warrant. Mother thereafter moved back to Indiana with J.O.

In July 2008, local law enforcement officers responded to the scene of a reported car wreck. Upon their arrival, police officers discovered Mother and then six-week-old J.O. in a vehicle that was in a ditch off the side of the road. While assisting Mother, the responding officers observed crack cocaine and drug paraphernalia inside Mother's vehicle. Consequently, Mother was arrested on D felony possession of cocaine and possession of paraphernalia charges, and J.O. was taken into protective custody. At the time of Mother's arrest, Mother informed the authorities that J.O.'s biological father was incarcerated, and that there was no other adult available to assume custody of the child.

The following day, PCDCS investigating case manager Michael Fiala (Fiala) spoke with Mother at the Porter County Jail. Mother admitted to Fiala that she had bought and used crack cocaine prior to getting into the car and driving with J.O. the previous night. Mother also provided Fiala with Father's name, stated he was J.O.'s biological father, and further explained that Father was incarcerated in the Lake County Jail on an outstanding robbery warrant. Fiala included this in-

---

1. Mother's parental rights were also terminated by the trial court in its April 2010 termination order. Mother does not participate in this appeal. Consequently, we limit our recitation of the facts to those pertinent solely to Father's appeal.

formation regarding Father's name and whereabouts in his "Detention Hearing Report to the Court" filed on July 10, 2008. (Appellant's App. p. 21). On July 16, 2008, PCDCS filed a verified CHINS petition which did not name Father as J.O.'s biological or alleged biological father, but instead contained the following language: "Paternity of [J.O.] has not been established. . . . " (Appellant's App. p. 23).[2] Father was not provided a copy of the CHINS petition, nor informed of the CHINS initial hearing date.

On July 19, 2008, following the initial CHINS hearing, the trial court issued an order adjudicating J.O. a CHINS. Father was not present at the CHINS hearing and was not represented by counsel. The CHINS order again indicated that paternity of J.O. had not been established and did not contain Father's name as either the biological or alleged father. In addition, PCDCS did not provide Father with a copy of the CHINS order.

On August 6, 2008, PCDCS filed its pre-dispositional report with the trial court, which indicated under the sub-heading "Parental History" that "paternity has not yet been established for [Father]." (Appellant's App. p. 31). The report later indicated, however, that J.O.'s family formerly "consisted of [J.O.] and his parents. The father is currently in Lake County Jail. . . ." (Appellant's App. p. 33). Nevertheless, Father was not made a party to the CHINS proceedings, he was not offered and/or referred for reunification services, he was not provided with a copy of the pre-dispositional report, and he was never advised that a dispositional hearing had been set for August 19, 2008.

During the ensuing months, Father was never made a party to the ongoing CHINS proceedings. In addition, PCDCS never attempted to contact Father, notify Father of the dispositional hearing or any other periodic case review hearing, provide Father with any copies of the case plans, or mail Father any copies of the trial court's orders. Meanwhile, Mother continued to struggle with her addiction to crack cocaine, was arrested and incarcerated on several occasions, and failed to successfully complete court-ordered reunification services.

In March 2009, PCDCS filed a petition seeking the involuntary termination of both Mother's and Father's parental rights to J.O. This time, however, PCDCS named Father as a party to the proceedings and mailed a copy of its termination petition to Father. Father, who remained incarcerated, thereafter participated in all termination hearings, either in person or telephonically.

A two-day evidentiary hearing on the termination petition commenced on June 15, 2009, and concluded on October 13, 2009. During the termination hearing, Father repeatedly, yet unsuccessfully, objected to the termination proceedings, claiming his due process rights had been violated when PCDCS and the trial court failed to comply with the CHINS statutes by not making him a party in the underlying CHINS proceedings, not providing Father with notice of any CHINS hearings, not advising Father of the conduct he needed to perform in order to gain reunification with J.O., and not providing Father

2. PCDCS case manager Amy Hilzley–Pittman explained during the termination hearing that it is the Departments policy to "presume paternity has not been established" if a child is born out of wedlock in a different state unless it receives a court order indicating otherwise.

(Transcript p. 143). However, she admitted that she had received a copy of J.O.'s social security number and birth certificate with Fathers name listed as the father from the Oklahoma hospital where J.O. was born.

with any of the trial court's orders. At the conclusion of the hearing, the trial court took the matter under advisement. On April 13, 2010, the trial court entered its judgment terminating Father's parental rights to J.O.

Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

On appeal Father contends that certain statutory requirements were not followed in the underlying CHINS proceedings resulting in the violation of his right to due process in the CHINS and termination proceedings. A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind.2005). Hence, "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct.App.1996), *trans. denied*. A case involving the State's authority to permanently sever a parent-child bond therefore demands the close consideration the Supreme Court has long required when a family association so undeniably important is at stake. *M.L.B. v. S.L.J.*, 519 U.S. 102, 103, 117 S.Ct. 555, 556–57, 136 L.Ed.2d 473 (1996). In addition, the involuntary termination of parental rights is an extreme measure that is designed to be used only as a last resort, when all other reasonable efforts have failed. *In re B.D.J.*, 728 N.E.2d 195, 199 (Ind.Ct.App.2000).

The Due Process Clause of the United States Constitution "prohibits state action that deprives a person of life, liberty, or property without a fair proceeding." *In re B.J.*, 879 N.E.2d 7, 16 (Ind.Ct.App. 2008), *trans. denied*. It is also well settled that the right to raise one's child is an "essential, basic right that is more precious than property rights." *In re C.C.*, 788 N.E.2d 847, 852 (Ind.Ct.App.2003), *trans. denied*. Thus, when the State seeks to terminate a parent-child relationship, it must do so in a manner that meets the constitutional requirements of the due process clause. *Hite v. Vanderburgh County Office of Family & Children*, 845 N.E.2d 175, 181 (Ind.Ct.App.2006). Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." *In re J.T.*, 740 N.E.2d 1261, 1264 (Ind.Ct.App.2000), *trans. denied*.

The nature of the process due in a termination of parental rights proceeding turns on a balancing of the following "three distinct factors" specified in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976): (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *A.P. v. Porter County Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind.Ct. App.2000), *trans. denied*. The balancing of these factors recognizes that although due process is not dependent on the underlying facts of a particular case, it is nevertheless flexible and calls for procedural protections as the situation demands. *Lawson v. Marion County Office of Family & Children*, 835 N.E.2d 577, 580 (Ind. Ct.App.2005). We must also keep in mind the general proposition that if the State imparts a due process right, then it must give that right. *A.P.*, 734 N.E.2d at 1112.

In *A.P.*, this court explained that our legislature has enacted an interlocking statutory scheme governing CHINS and involuntary termination of parental rights cases designed to "protect the rights of

parents in raising their children while allowing the State to effect its legitimate interest in protecting children from harm." *Id.* at 1112. We further explained that "although termination proceedings are distinct from CHINS proceedings, an involuntary termination proceeding is governed by the procedures prescribed by the CHINS statutes contained in Indiana Code Article 31–34." *Id.* Thus, "procedural irregularities in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *Id.* at 1112–13.

Before we can properly evaluate the adequacy of the State's process, we must first identify the precise nature of the private interest threatened by the State. *C.C.*, 788 N.E.2d at 852. In termination cases, both the private interests of the parent and the countervailing governmental interests that are affected by the proceeding are substantial. In particular, this termination action concerns Father's interest in the care, custody, and control of his child, which has been repeatedly recognized as one of the most valued relationships in our society. *In re E.D.*, 902 N.E.2d 316, 321 (Ind.Ct.App.2009), *trans. denied.* As such, Father's interest in the accuracy and fairness of the termination hearing is "a commanding one." *Id.*

The State's *parens patriae* interest in protecting the health and welfare of children, on the other hand, is also significant. "Although the State does not gain when it separates children from the custody of fit parents, the State has a compelling interest in protecting the welfare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment are at issue." *Tillotson v. Clay County Dep't of Family & Children*, 777 N.E.2d 741, 745 (Ind.Ct.App.2002), *trans. denied.* Furthermore, delays in the

adjudication of a termination case impose significant costs upon the functions of government as well as an intangible cost to the lives of the children involved. *E.D.*, 902 N.E.2d at 322.

When balancing these competing interests between a parent and the State, we must also consider the risk of error created by the challenged procedure. Here, the challenged procedure involved the State's initiation and prosecution of the underlying CHINS and involuntary termination proceedings without ever naming Father as a party to the CHINS case, notifying Father of any of the CHINS hearings, or providing Father with any CHINS documents or orders, including the trial court's dispositional order and PCDCS's case plans, notwithstanding PCDCS's admitted knowledge of Father's name and whereabouts since the time of J.O.'s initial detention.

Pursuant to Indiana Code section 31–34–3–4, notice that a child has been taken into custody under Indiana Code chapter 31–34–2 "must" be given "to *each* of the child's parents as described in sections 1 through 3 of this chapter." Ind.Code § 31–34–3–4(2) (emphasis added). Indiana code section 31–34–3–2 requires PCDCS to "make a good faith effort, not more than six (6) hours after the child has been taken into custody, to leave written notice at the last known address of the child's [ ] parent ... that the child has been taken into custody." The record reveals no such notice was ever provided to Father in the present case, despite PCDCS's admitted knowledge of Father's whereabouts. Moreover, Father was never provided with notice of any subsequent CHINS hearings or copies of CHINS documents, including PCDCS case plans and trial court orders, in violation of numerous additional CHINS statutes. *See, e.g.*, I.C. § 31–34–4–6 (county office of family and children *shall* sub-

mit written information to parent of alleged CHINS regarding parent's legal rights to be represented by counsel, cross-examine witnesses, and present evidence on parent's behalf at *each* CHINS court proceeding); I.C. § 31–34–9–7 (child's parents are parties to CHINS proceedings and have all rights of parties under Indiana Rules of Trial Procedures); I.C. § 31–34–10–5 (trial court has duty to inform parent that if child adjudicated CHINS, parent may be required to participate in program of care, treatment, or rehabilitation for child, be held financially responsible for services rendered to child, and may controvert any allegations made during dispositional or other hearing concerning parent's participation); I.C. § 31–34–15–3 (copy of completed case plans *shall* be sent to child's parent); I.C. § 31–34–16–4 (trial court *shall* advise parent that failure to participate in services as required by dispositional order of court can lead to termination of parental rights).[3]

A review of the record confirms Father's allegations that PCDCS was well-aware of Father's name, place of residence, and alleged paternity of J.O. throughout the entirety of the CHINS proceedings. PCDCS case manager Amy Hilzley–Pittman (Pittman) repeatedly acknowledged during the termination hearing that although she was "given [Father's] name," and discovered Father was "incarcerated in [the] Lake County [J]ail" shortly after J.O. was initially removed from Mother's care, Pittman did not attempt to contact Father but instead filed "paternity paperwork with the Child Support Prosecutor." (Transcript p. 60; 132).[4] When asked to describe the amount of contact she had with Father throughout the entire case, Pittman replied, "I have had none." (Tr. p. 60). When further pressed as to whether she had even "tried to contact [Father] personally" since the time she "found out" who Father was, Pittman again replied, "No." (Tr. p. 52).

Regarding PCDCS's refusal to name Father as a party to the underlying CHINS case and to provide him with proper notice of all CHINS proceedings, Pittman testified as follows:

Q: Did you note Father's name anywhere in [the CHINS] petition?

[Pittman]: I don't recall.

Q: Okay. Let me hand you a copy of the Verified Petition Alleging a Child in Need of Services filed on July 16th of 2008.

[Pittman]: No, I don't see [Father's] name.

---

**3.** *See also* I.C. § 31–34–5–1 (notice of time, place, and purpose of detention hearing *shall* be given to child's parent if the person can be located); I.C. § 31–34–10–2 (summons to attend initial hearing on CHINS petition *shall* be issued to parent of child); I.C. § 31–34–18–6 (copy of pre-dispositional report and/or factual summary of report shall be made available to parent before dispositional hearing); I.C. § 31–34–19–9 (the court shall advise child's parent of the procedures to modify dispositional order under [I.C. § ] 31–34–23); I.C. § 31–34–21–4 (county office of family and children shall send notice of any periodic case review, including case review and permanency hearing, to the child's parent at least five days before the review); I.C. § 31– 34–22–2 (copies and/or factual summaries of reports prepared by the State for juvenile court's review of the court's dispositional decree or prepared for use at periodic case review shall be made available to the child's parent).

**4.** Pittman also admitted that although her original request for the Porter County Child Support Prosecutor's Office to establish paternity had been made in early August 2008, she never received a response and did not attempt to "follow-up" until "February or March 2009 when [she] had determined [she] wanted to file [for] ... termination of parental rights." (Tr. p. 159).

Q: Okay. And I just want to be clear, that at that point you did know ... [F]ather's whereabouts as having been incarcerated. Is that correct. Because it was already in the 310 or 311 Report?

[Pittman]: I believe so, yes.

Q: Okay. Is it normally [PCDCS's] practice to provide both mother and father, or putative father notice of hearings?

[Pittman]: Normally, yes.

Q: Okay. Did you do so for that hearing?

[Pittman]: I did not, no.

(Tr. pp. 133–34).

Similarly, when questioned as to whether it was "customary" for PCDCS to "provide fathers, putative or adjudicated, notice [and copies] of all pleadings," PCDCS case supervisor Tina Dingman (Dingman) answered, "Yes." (Tr. p. 188). However, when asked why said policy "didn't happen in this case," Dingman replied, "I don't know." (Tr. p. 188). Dingman also confirmed that Father was never contacted "by anyone" from PCDCS. (Tr. p. 190). In addition, Mother confirmed that she had made PCDCS aware of Father's name and paternity of J.O. early in the CHINS case. Court-appointed special advocate James Mooneyhan likewise acknowledged that he knew Father's name and that Father was incarcerated in the Lake County Jail at the time of the detention hearing in July 2008.

In considering the *Mathews v. Eldridge* due process factors under these circumstances, it is apparent that the risk of error created by PCDCS's decision to refrain from naming Father as a party to the case while continuing with the underlying CHINS proceedings in Father's absence, despite PCDCS's actual knowledge of Father's name and whereabouts, coupled with PCDCS's and the trial court's blatant disregard of statutory law mandating that Father be provided with notice of all CHINS hearings and copies of all CHINS orders and case plans, resulted in a violation of Father's right to due process. To hold otherwise, and allow PCDCS, with the assistance of the trial court, to remove a child from his home, commence CHINS proceedings, and ultimately terminate a parent-child relationship while refusing to abide by significant and substantial portions of the CHINS and termination statutes would be incongruous. As stated previously, once the State imparts a due process right, then it must give that right. *See A.P.,* 734 N.E.2d at 1112.

Notwithstanding our holding today, we pause to clarify that we are not commenting upon the sufficiency of the evidence in this case or on the extent to which a county office of the Indiana Department of Child Services must provide services to parents in a CHINS case. Nor should this opinion be construed as adding an additional element to those already required by Indiana's termination statute. *See* I.C. § 31–35–2–4; *see also A.P.,* 734 N.E.2d at 1118. Rather, we simply cannot ignore PCDCS's and the trial court's failure to follow numerous and substantial statutory mandates in this matter. As such, the situation demands that we reverse the trial court's termination order on procedural due process grounds.

### CONCLUSION

· Based on the foregoing, we conclude that the trial court's order, terminating Father's parental rights to his minor child, violated Father's due process rights.

Reversed.

BAILEY, J., concurs.

KIRSCH, J., dissents with separate opinion.

KIRSCH, Judge, *dissenting*.

I fully agree with my colleagues conclusion that Father was denied due process during the CHINS proceeding. Indeed, I would be harsher in my criticism of the Porter County Office of Child Services and its knowing and repeated failure to provide Father with the rights due to him. That said, I do not believe that such failures deprived Father of procedural due process with respect to the termination of his parental rights.

During the termination proceeding, Father was provided with both notice and the opportunity to be heard. The trial court listened to and weighed Father's arguments, and its decision to terminate his parental rights was supported by evidence that went far beyond the clear and convincing standard. Finally, the majority's decision to reverse that decision will result in tremendous disruption to the life of the child and the only home he has known, but will not provide any corresponding benefit.

Other than sperm donation, the Father has made no contributions to the life of this child. He has no relationship with the child, has seen the child only two or three times since he was born, and has not seen him at all since July 2008. He has not contributed to the support of his child in any way. He has had a drug addiction that spans most of his adult life and has spent a significant portion of that life in prison. Indeed, if Father remains in prison until his scheduled release date in 2011, he will have spent ten of the last thirteen years in incarceration. Father's older child is under guardianship in Oklahoma. At the termination hearing, the Father presented no evidence to counter the overwhelming evidence of the Division of Child Services supporting the trial court's termination decision.

The child here has had a safe, nurturing, permanent, and drug-free home with his foster parents since he was a few weeks old. It is the only home he has known. In the absence of any evidence that the trial court's decision was erroneous, I would not disrupt that life, but would affirm the trial court in all respects.