**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 17 2012, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**SARAH K. MARLER**
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE:

**SHARON R. ALBRECHT**
South Bend, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) |
| O.H. & J.M. ( Minor Children), | ) ) |
| And | ) ) |
| C.H. (Mother), | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 71A05-1112-JT-707 ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE ST. JOSEPH PROBATE COURT

**July 17, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, C.H. (Mother), appeals the trial court's termination of her parental rights to her minor children, J.M. and O.H.

We affirm.

ISSUES

Mother raises three issues on appeal, which we restate as the following two issues:

(1) Whether the State presented sufficient evidence to conclude that the continuation of the parent-child relationship posed a threat to the well-being of the children; and

(2) Whether termination of Mother's parental rights was in the children's best interest.

FACTS AND PROCEDURAL HISTORY

Mother is the mother of J.M., born August 8, 2003 and O.H., born March 25, 2006. On March 17, 2009, the Indiana Department of Child Services (DCS) received a report that the health and safety of the children was endangered. The report stated that

Mother was smoking marijuana in the presence of the children, deliberately blowing smoke in J.M.'s face and allowing J.M. to smoke marijuana. It was also reported that Mother was selling J.M.'s prescription Ritalin, that the house was filthy, and that she yelled at the children and pulled their hair when angry or just to move them out of the way. The following day, DCS investigated the allegations of the report and interviewed the children at the CASIE center, a child advocacy center in South Bend, Indiana. During the interview, the children disclosed that Mother had exposed them to regular drug use and J.M. was able to show the proper way to break up marijuana, clean it and roll it into cigarettes, even demonstrating how to lick the paper. Having substantiated the allegations, DCS removed the children from Mother's care. The children were placed in the care of their maternal grandmother (Grandmother).

On March 26, 2009, DCS filed verified petitions alleging that J.M. and O.H. were Children in Need of Services (CHINS). During the initial hearing on March 30, 2009, Mother admitted the allegations. On May 13, 2009, the trial court conducted a CHINS dispositional hearing and ordered Mother to participate in the following services, among others: regular visitation with the children, random drug screens, complete a psychological evaluation, and cooperate with all services provided by DCS.

Mother visited with the children on a regular basis until May 13, 2009, when the trial court placed the children back into Mother's home on a trial basis. However, on September 30, 2009, the trial court ordered the children removed from the home due to Mother's inability to stop her drug use. After DCS removed the children, Mother tested

positive for marijuana on several occasions and on June 29, 2009, she also tested positive for methamphetamine. Because of Mother's unsuccessful drug screens, the trial court ordered visitation with the children suspended on April 28, 2010 until Mother could produce three negative drug screens. Visitation resumed in June of 2010.

Charlene Graff (Graff) of Lifeline Youth and Family Services supervised the visits between Mother and the children. Although Mother consistently visited with the children, there were often problems during visitation and Graff had to intervene on several occasions because of Mother's inappropriate actions and discipline. Graff testified that during a visit in October 2010, Mother engaged in a "screaming match" with four-year-old O.H. because O.H. wanted Mother to put her shoes on while Mother opined that O.H. was big enough to do that herself. (Transcript p. 42). Similarly, Graff stated that during a visit to the grocery store with Mother and the children in November 2010, Mother became infuriated when Graff aided Mother in trying to corral the children who were running in different directions. Mother began yelling that Graff was interfering with her parenting. She raised her voice several times and began "slamming things in the cart, and people were beginning to look." (Tr. p. 44). Due to these continued outbursts, DCS decided that they could no longer guarantee the children's safety and they suspended visitation in December 2010.

Mother's attendance at a substance abuse program was virtually non-existent during the first year of the proceedings and she had yet to begin treatment at the date of the permanency hearing in April of 2010. Because the substance abuse program therapist

4

thought that Mother was being "exceptionally deceptive," Mother had to complete a second substance abuse assessment. (DCS Exh. A, p. 34). She was very resistant to taking another evaluation. After the trial court suspended visitation with its order of April 28, 2010, Mother became compliant with her substance abuse treatment program.

Although Mother completed the psychological evaluation, Mother refused to participate in individual therapy sessions. In January 2011, after DCS had filed its petition to terminate Mother's parental rights, Mother began attending therapy on a consistent basis. After seeing her initial therapist for approximately six to eight sessions, Mother requested a change in therapists. She began working with therapist Ann Hofsommer (Hofsommer) on February 11, 2011. Hofsommer identified Mother's primary issues to be depression, to prevent a relapse into substance abuse, and a personality disorder. Mother constantly believed that she was misunderstood and displayed an unwillingness to acknowledge that she had to change. Hofsommer believed that Mother's personality caused her to distort the information that she received. While Mother could make progress during a session, within a brief period Mother would return to her beliefs that no one understood her and that their misunderstanding was the cause of all her problems. After six weeks without any progress, Hofsommer told Mother that she had to make some effort and indicate a willingness to change her behavior. Mother bluntly informed Hofsommer that she would prefer to go elsewhere for therapy and she was consequently discharged without having made any progress. Following discharge, Mother elected to continue therapy sessions with Michelle Olsen (Olsen) and Michelle

Haas (Haas). However, both therapists acknowledged their expertise to be in substance abuse treatment, not individual counseling.

DCS attempted to provide family therapy through two different agencies. Both attempts were unsuccessful. After meeting Mother, the initial family therapist found Mother so threatening and unstable that she refused to continue to provide services. A second attempt was made in the summer of 2011. However, prior to the start of this joint family session, Mother refused to cooperate and to meet Grandmother, saying, "If I hurt her, it's going to be [DCS'] fault because [they] put me in that situation." (Tr. p. 130).

During the pendency of the CHINS proceedings, Mother was charged with and convicted of welfare fraud, a Class C felony, as she continued to collect social security disability checks on behalf of J.M. while J.M. was in Grandmother's care. Mother pled guilty and in June 2011, she was sentenced to probation and ordered to pay $ 8,330.72 in restitution. The Social Security Administration has garnished Mother's entire SSI check until the restitution is fully offset. Meanwhile, Mother earns income by doing odd jobs such as scrapping, raking leaves, mowing yards, and babysitting.

On November 30, 2010, DCS filed its petitions to involuntarily terminate the parent-child relationship. On November 18, 2011, the trial court conducted an evidentiary hearing and took the matter under advisement. Thereafter, on December 8,

2011, the trial court entered its Order to terminate the parent-child relationship between

O.H. and J.M.[1], concluding that

> Indiana Code [section] 31-35-2-4 sets out the elements that the Department of Child Services must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship. That statute requires the following:
>
> (A) One (1) of the following exists:
> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree; in the instant cause, the Order of Disposition was entered on May 13, 2009.
>
> (B) there is a reasonable probability that:
> (ii) continuation of the parent-child relationship poses a threat to the well-being of the children; Mother has accomplished only part of the requirements of the service plan designed for her: she has now shown evidence of being drug free. However, Mother has not progressed sufficiently in the individual therapy to recognize her shortcomings – shortcomings that stand in the way of her being an effective and competent parent. She denies any wrongdoing; she refuses to be held accountable, preferring to blame others. The girls have remained with maternal grandmother. Their bond with her is strong. Mother's hatred of her mother therefore represents an obstacle to any reunification. Additionally, the girls resist visiting with Mother. They have progressed educationally and psychologically. Continuing the parent-child relationship poses a threat to their stability.
>
> (C) termination is in the best interests of the children; The right of parents to raise their children is guaranteed by our constitution. Children possess their own rights: the right to be safe from harm, the right to be loved and cared for by a parent. Mother's psychological problems have not been addressed. Her hatred of her own mother and her belief that everyone is at fault but her has made her unable to accept help. The girls deserve more. They deserve a parent who assumes responsibility for shortcomings and

---

[1] The trial court issued separate orders for each child, with each order containing the same findings and conclusions of law.

7

accepts assistance to remedy the problem. Termination of the parental rights of [Mother] is in the best interests of the children.

(D) there is a satisfactory plan for the care and treatment of the children. The plan is adoption and/or guardianship by the maternal grandmother. This, in the [c]ourt's opinion, provides the greatest opportunity for these young girls to flourish.

(Appellant's App. pp. 34-35; 40-41).

Mother now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

On appeal, Mother argues that the evidence was insufficient to support the termination of her parental rights to her minor children because DCS did not prove that that continuing the parent-child relationship posed a threat to their well-being.

We recognize that the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re J.S.O.,* 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. *Id.* However, the trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination of a parent-child relationship. *In re J.H.,* 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), *trans. denied.* Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id.*

In reviewing termination proceedings on appeal, this court must not reweigh the evidence nor assess the credibility of the witnesses. *Id.* We consider only the evidence

8

that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id.* Where, as here, the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings, and second, whether the findings support the conclusions of law. *Id.* In deference to the trial court's position to assess the evidence, we set aside the trial court's findings and judgment terminating the parent-child relationship only if they are clearly erroneous. *Id.*

In order to terminate Mother's parental rights, DCS was required to prove by clear and convincing evidence:

> (B) that one of the following [was] true:
> (i)  There [was] a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents [would] not be remedied.
> (ii)  There [was] a reasonable probability that the continuation of the parent-child relationship [posed] a threat to the well-being of the child.
> (iii)  The child [had], on two (2) separate occasions, been adjudicated [] in need of services[.]
> (C) that termination [was] in the best interests of the child.

Ind. Code § 31-35-2-4(b)(2)(B), -(C); *Bester v. Lake Cnty. Office of Family and Children,* 839 N.E.2d 143, 148 (Ind. 2005). Clear and convincing evidence as a standard of proof requires the existence of a fact to "be highly probable." *Hardy v. Hardy,* 910 N.E.2d 851, 859 (Ind. Ct. App. 2009). It need not reveal that "the continued custody of the parent[] is wholly inadequate for the child's very survival." *Bester,* 839 N.E.2d at 148 (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1233 (Ind.

9

1992)).    Rather, it is sufficient to show that the child's emotional and physical development are threatened by the parent's custody.  *Id.*

## I. *The Children's Well-Being*

Based on our review of the record, we cannot agree with Mother that there was insufficient evidence to show that the continuation of the parent-child relationship posed a threat to the well-being of the children.

A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship.  *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002).    Instead, when the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate.  *Id.*

Here, the trial court found that:

15.    On November 30, 2010, DCS filed its Petition to Involuntarily Terminate Mother's Parental Rights.

16. The hearing on the petition was held November 18, 2011.

17.    Anne Hofsommer, a Licensed Clinical Social Worker, worked with Mother beginning February 15, 2011. Ms. Hofsommer learned that Mother was dealing with recurrent depression, a personality disorder, and the possibility of relapsing into marijuana use.

18. Ms. Hofsommer determined that very complex issues existed in Mother's case; including serious mental health issues and a profound distrust of others.

19.  The social worker concluded that after six (6) weeks of therapy with Mother, no progress was made.  She testified that after that period, Mother

remained unwilling to acknowledge the need to make changes. Mother still saw herself as a good parent – one who felt unjustly accused.

20. Charlene Graff, home based parent aide with Lifeline Services, was assigned to work with Mother beginning in July of 2010. Mother told Ms. Graff that she was interfering with her parenting and that she would raise her children the way she wanted. Ms. Graff also witnessed violent outbursts by Mother with the children. Unsupervised visitation never occurred between Mother and the girls.

21. Maternal Grandmother [] provides care for both girls currently. [Grandmother] testified that Mother had threatened to kill her at a Child and Family team meeting. The [c]ourt later entered a "No Contact Order."

22. When the [c]ourt lifted the "No Contact Order" so that family therapy could occur, Mother refused to attend.

* * *

24. Sheila LeSure, a Family Care Manager for DCS, became involved with Mother's case on October 18, 2010. Ms. LeSure was assigned after Mother requested a new case manager. She testified that Mother's order to participate in individual counseling was not followed due to Mother's failure to actively participate and deal with her past childhood trauma. Mother also has not maintained employment and is currently on probation for the felony. While Mother completed her drug treatment, she failed to begin it until June of 2010, over one (1) full year after the children were removed initially.

(Appellant's App. pp. 33-34; 39-40).

Although the trial court found that Mother had not progressed sufficiently in her individual therapy, Mother contends that the evidence presented at trial failed to support this finding. Focusing on the testimony of therapists Haas and Olsen, she asserts that both therapists established that she was making strides in conquering her shortcomings. While we agree with Mother that therapists Haas and Olsen were the most positive in their report on Mother's accomplishments, the therapists also testified to their ongoing

11

concerns with Mother's anger and distrust issues. Moreover, we note that Mother choose therapists Haas and Olsen—therapists specialized in substance abuse issues—to help her in her individual therapy sessions after she was discharged by Hofsommer.

Hofsommer gave a completely different account of Mother's willingness to participate in services. Hofsommer testified to Mother's mood swings: while Mother could make progress during a session, within a brief period Mother would return to her beliefs that no one understood her and that their misunderstanding was the cause of all her problems. After six weeks without any progress, Hofsommer informed Mother that she had to make some effort and indicate some willingness to change her behavior. Refusing to do so, Mother was discharged without having made any progress.

When DCS attempted to proceed with family therapy, the first family therapist felt threatened by Mother and refused to continue. When a second attempt was made, Mother blatantly refused to participate, threatening to hurt Grandmother instead.

Mother's threatening and unstable behavior was also displayed in her parenting of the children. Graff supervised the visits of Mother with her children and had to intervene on several occasions because of Mother's inappropriate actions and discipline. Graff testified that on one occasion, Mother entered into a "screaming match" with four-year-old O.H. over shoes. (Tr. p. 42). Graff also recounted a visit to the grocery store with Mother and the children in November 2010, where Mother became so infuriated to the point other people were beginning to take notice. Although Mother visited with the

children, she never progressed beyond supervised visitations, and all visitation was suspended in December 2010.

Despite Mother's present ability to control her substance abuse issues, there is ample evidence in the record to suggest that her habitual patterns of conduct pose a substantial probability of future neglect and deprivation of the children. Not only did she fail to address these shortcomings—only commencing individual therapy session after DCS had filed its petition to terminate her parental rights—it is clear that she does not even accept them, placing responsibility with everyone except herself. We affirm the trial court's conclusion that continuation of the parent-child relationship poses a threat to the minor children. [2]

## II. *Best Interests of the Children*

Next, Mother argues that it was not in the children's best interests for the trial court to terminate Mother's parental rights because "the evidence supported that Mother had successfully participated in therapy, made progress, and actually completed therapy." (Appellant's Br. p. 11). Additionally, she claims that it would not be harmful for the children to remain in relative placement while visitation and therapy continued.

---

[2] Although Mother also advances an argument that the conditions that resulted in the children's removal were remedied, we will not address this claim. First, I.C. § 31-35-2-4 is written in the disjunctive; it requires the trial court to find only one of the requirements of subsection (B) by clear and convincing evidence. Standing alone, the trial court's finding that the continuation of the parent-child relationship posed a threat to the well-being of the children satisfied the requirement listed in subsection (B). Second, the trial court based its order to terminate the parent-child relationship on the claim we addressed above; the trial court did not formulate any conclusions with respect to the remediation of conditions.

13

In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS to the totality of the evidence. *In re T.F.,* 743 N.E.2d 766, 776 (Ind. Ct. App. 2001). In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* When analyzing a child's best interests, we recognize that permanency is a central consideration. *In re G.Y.,* 904 N.E.2d 1257, 1265 (Ind. 2009).

Mother's arguments are misplaced. The evidence clearly reflects that while she completed substance abuse therapy, she has yet to complete individual therapy sessions and to address her health and anger issues. Throughout the proceedings she has displayed a lack of participation and absolute unwillingness to accept responsibility for her behavior. The children have been out of Mother's home since September 30, 2009 and she has not visited with them since DCS suspended visitation in December 2010.

The record reflects that the children are thriving in their placement with Grandmother. Grandmother is very nurturing and able to appropriately identify the needs of each child. The children are doing well at school, are involved in extracurricular activities, and are happy in the home. Accordingly, we find that the trial court did not err in concluding that termination of Mother's parental rights was in the children's best interests.

## CONCLUSION

Based on the foregoing, we conclude that (1) the DCS provided sufficient evidence that continuation of the parent-child relationship posed a threat to the well-being

14

of the children and (2) the trial court did not err in concluding that termination of Mother's parental rights was in the minor children's best interests.

Affirmed.

NAJAM, J. and DARDEN, J. concur