**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 09 2014, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**WENDY J. GENSCH**
Ligonier, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE            )
TERMINATION OF THE PARENT-      )
CHILD RELATIONSHIP OF:          )
                                )
E.H. (Minor Child),             )
                                )
    AND              )
                                )
S.F. (Mother),                  )
                                )
    Appellant-Respondent,   )
                                )
      vs.                   )    No. 57A03-1403-JT-101
                                )
THE INDIANA DEPARTMENT OF       )
CHILD SERVICES,                 )
                                )
    Appellee-Petitioner.    )

APPEAL FROM THE NOBLE SUPERIOR COURT
The Honorable Michael J. Kramer, Judge
Cause No. 57D02-1310-JT-9

**October 9, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, S.F. (Mother), appeals the trial court's termination of her parental rights to her minor child, E.H.[1]

We affirm.

ISSUE

Mother raises one issue on appeal, which we restate as: Whether there is sufficient evidence supporting the trial court's conclusion that there was a reasonable probability that Mother would not remedy the conditions which resulted in E.H.'s removal from the home.

FACTS AND PROCEDURAL HISTORY

Mother is the mother of E.H., born on June 13, 2011. On July 7, 2012, Appellee-Petitioner, the Indiana Department of Child Services (DCS) at Noble County, received

---

[1] Prior to the trial court's factfinding hearing, E.H.'s Father signed a consent to the adoption of E.H. and therefore is not a party in these proceedings.

allegations that Mother, who was staying at a local shelter with E.H., was abusive to her minor child. It was reported that Mother constantly screamed at E.H., had "smacked" his mouth, hands, and bottom several times, and had yanked his arm so harshly that there was a concern that his arm had been pulled out of its socket. (DCS's Exh. 4, p. 3). Mother also left E.H. alone in the bathtub and neglected to feed him.

That same day, DCS family case manager Dominique Carmer (FCM Carmer) met with Mother. Although FCM Carmer did not observe any marks or bruises, Mother appeared to be angry with E.H. and yelled at him several times "for just being a baby, . . . just sitting there." (Transcript p. 40). Mother told FCM Carmer that she had just been "kicked out of her friends (sic) house" and had nowhere else to go. (Tr. p. 24). Because Mother had been in a fight with other residents, the shelter did not permit her to stay. Shelter workers informed FCM Carmer that Mother had threatened suicide if her child was taken from her. Because her supervisor advised that there was not enough physical evidence, FCM Carmer did not remove E.H. and instead she and Mother agreed to institute a safety plan. The provisions of the safety plan mandated that Mother would remain at the shelter until she was able to get transportation to a friend's residence where she would be allowed to reside. Mother agreed to ensure proper food and clothing for E.H. and to discipline him in a safe manner.

On July 10, 2012, FCM Carmer visited Mother at her friend's home. Besides Mother, two other adults were in the home. The other adults each separately stated to FCM Carmer that they had observed Mother "beating" the child and "hitting" him

3

"because he looks like his father." (Tr. p. 29). This time, FCM Carmer noticed bruising shaped like a finger on E.H.'s bottom, underneath the diaper. The FCM accompanied Mother and E.H. to the local hospital, where a full body scan did not indicate any internal injuries. While they were in the hospital, Mother confided that she had taken a "bunch of pills" to end an unwanted pregnancy. (Tr. p. 32).

Concluding that Mother had violated the safety plan, DCS removed E.H. later that same day with the assistance of law enforcement. When FCM Carmer explained to Mother the reasons for E.H.'s removal, Mother stated "she was going to commit suicide" and ran past the FCM into the street. (Tr. p. 33). A police officer pursued her and pulled her out of the road before an oncoming vehicle hit her. Mother was handcuffed and placed in the police vehicle. Once inside the vehicle, she began hitting her head against the cage that separates the front and back compartments of the police car. The officer placed Mother on a twenty-four hour hold at Oaklawn Center, a psychiatric center, in Goshen. She remained at Oaklawn until July 16, 2012.

On July 20, 2012, Mother completed an intake assessment at the Bowen Center, a mental health care services provider, at DCS's referral. During the assessment, Mother was diagnosed with a major depressive disorder without psychotic features based on Mother's reported depressive symptoms and recent suicide attempt. A crisis plan was developed and Mother was recommended to follow up with her psychiatrist to ensure she was on the proper medication.

On October 19, 2012, the trial court adjudicated E.H. to be a child in need of services (CHINS). A dispositional order was issued on November 13, 2012. In its dispositional order, the trial court ordered Mother to complete a psychological and parenting assessment and follow all recommendations therefrom, enroll and attend individual therapy sessions, comply with supervised visitation, attend home-based parenting services, and maintain contact with the DCS.

During a review hearing on January 18, 2013, the trial court ordered Mother to participate in a parenting/psychological assessment and a psychiatric assessment and follow all recommendations therefrom, including compliance with the medication management. The trial court also ordered DCS to commence supervised visitation five days per week for two hours each and to begin unsupervised visitation when deemed appropriate by all service providers.

On April 9, 2013, Mother presented herself for a psychiatric evaluation at the Bowen Center. She was reported to get "extremely angry and agitated when she does not like something or when things do not go her way." (DCS Exh. 8, p. 1). Although Mother denied "any thoughts of hurting herself," she informed the assessor that she had "made multiple suicide attempts in the past." (DCS Exh. pp. 1, 2). Mother was diagnosed with bipolar disorder and it was recommended that she continue her medications and start individual psychotherapy to monitor her symptoms and learn more coping skills.

Approximately ten days later, on April 17, 2013, Mother took a psychological evaluation and parenting assessment with Dr. Siquilla Liebetrau (Dr. Liebetrau), a

psychologist employed by the Bowen Center. Two sets of Mother's parenting tests were declared invalid because Mother's answers revealed that she was "faking good," *i.e.*, presenting herself in an overtly positive light by lying about things normal people admit to, even though she was told that the tests were designed to pick up this particular behavior. (Tr. p. 83). Despite Mother's faking good, the report still yielded some valid findings. Particularly, the report found that Mother has a history of poor decision making and her depression may impair her ability to handle her parenting responsibilities. Dr. Liebetrau recommended Mother to participate in individual therapy and psychiatric medication management, and parenting education and home-based services.

Throughout the course of this case, Mother's compliance with her medication regime was hit or miss. Mother admitted that, at times, she did not take her medication. When asked as to the reason therefore, Mother provided several excuses: her family encouraged her to "just let God handle it [because] [H]e'll take [her] problems away and [she] won't need to be a fucked up retard on medication the rest of [her] life;" she could not afford her medication; and because of the resulting weight gain. (Tr. p. 263).

Mother sporadically participated in DCS's referred services. Initially, Mother was referred to group therapy, individual therapy, parenting class and medication management services at Oaklawn. However, Mother missed several appointments and when she did attend, she was argumentative, did not participate, and used her phone. On February 27, 2013, Oaklawn terminated Mother's services because she was noncompliant and disrespectful.

Thereafter, DCS referred Mother to services at Bowen. Although she failed to complete Bowen's parenting class, a supervised visitation provider worked on parenting skills with Mother on an individual basis. At times, Mother would put her parenting skills into practice, at other time she did not. Overall, Mother's progress in "positive parenting interactions" was "inconsistent." (Tr. p. 173). Mother attended individual therapy through Bowen in April and May of 2013. She stopped participating in services on May 1, 2013, when she was incarcerated on a theft conviction.

From July 2012 until May 1, 2013, Mother visited E.H. three times per week for a weekly total of ten hours. However, during Mother's supervised visitations several problems surfaced. At the September 12, 2012 visit, Mother threatened to "smack" E.H. to stop him from putting his fingers in an electrical outlet. (Tr. p. 136). She then actually smacked his hand at the subsequent visit, even though she denied doing so when the service provider reminded her that "hitting was not allowed during visitation." (Tr. p. 139). Mother again spanked E.H. during the September 19, 2012 visit and upon being advised to calm down, Mother replied, "no, this is fucking bullshit." (Tr. p. 142). Mother's October 3, 2012 visit was cancelled because Mother was detained by the probation department for fighting with another woman. On January 29, 2013, Mother allowed E.H. to play with lit candles because she wanted to teach him to stay away from fire. Three days later, Mother sprinkled weight loss powder on food she shared with E.H. After being asked by the services provider not to share it with her child, Mother still

allowed E.H. to take a bite and then asked the services provider not to report her. Mother has not visited E.H. or contacted him since her incarceration on May 1, 2013.

During the pendency of this case, Mother was convicted of or on probation for several different charges. In February 2012, Mother pled guilty to theft, a Class D felony, and was sentenced to eighteen months incarceration, all suspended to probation. In July 2012, Mother again pled guilty to theft, a Class D felony, and received the same sentence, "all suspended on one year probation." (DCS Exh. 15, p. 3). However, she violated her probation and was sentenced to community service. On April 22, 2013, Mother was incarcerated for nine hours stemming from a theft committed in February 2013. On March 15, 2013, Mother was convicted for a Class A misdemeanor battery and sentenced to one year incarceration, which was suspended. Thereafter, on June 17, 2013, she pled guilty to a Class D felony theft and was sentenced to three years imprisonment with two years suspended. Mother's application for home detention was denied due to her continual discipline problems and suicidal threats. On December 19, 2013, the trial court ordered Mother to serve her previously suspended sentences. At the time of filing this appeal, Mother's projected release date was October 4, 2015.

On October 21, 2013, the DCS filed its petition to terminate Mother's parental rights to her minor child. On January 30, February 7, and 14, 2014, the trial court conducted an evidentiary hearing. On February 14, 2014, the trial court issued its findings of fact and conclusions of law. Concluding that there is a reasonable probability that the conditions that resulted in E.H.'s removal and reasons for the placement outside

8

the child's home will not be remedied because Mother is unable to care for the child and has not been responsive to services, the trial court terminated Mother's parental rights to E.H.

Mother now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

On appeal, Mother argues that the DCS did not produce sufficient evidence to support the termination of her parental rights to her minor child. We recognize that the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re J.S.O.,* 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. *Id.* However, the trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination of a parent-child relationship. *In re J.H.,* 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), *trans. denied.* Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id.*

In reviewing termination proceedings on appeal, this court must not reweigh the evidence nor assess the credibility of the witnesses. *Id.* We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id.* Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the

9

findings, and second, whether the findings support the conclusions of law. *Id.* In deference to the trial court's position to assess the evidence, we set aside the trial court's findings and judgment terminating the parent-child relationship only if they are clearly erroneous. *Id.*

In the instant case, Mother challenges the trial court's conclusion of law terminating her parental rights because there was not sufficient evidence to prove that the conditions that led to the removal of her child from the home and the reasons for placement outside the home would not be remedied. In order to terminate her rights, DCS was required to prove by clear and convincing evidence:

> (B) that one of the following [was] true:
>> (i) There [was] a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents [would] not be remedied.
>> (ii) There [was] a reasonable probability that the continuation of the parent-child relationship[s] [posed] a threat to the well-being of the child.
>> (iii) The child [had], on two (2) separate occasions, been adjudicated [] in need of services[.]
> (C) that termination [was] in the best interests of the child.

Ind. Code § 31-35-2-4(b)(2)(B), -(C); *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 148 (Ind. 2005). Clear and convincing evidence as a standard of proof requires the existence of a fact to "be highly probable." *Hardy v. Hardy,* 910 N.E.2d 851, 859 (Ind. Ct. App. 2009). It need not reveal that "the continued custody of the parents is wholly inadequate for the child's very survival." *Bester,* 839 N.E.2d at 148 (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1233 (Ind. 1992)). Rather, it

10

is sufficient to show that the child's emotional and physical development are threatened by the parent's custody. *Id.*

When determining whether there is a reasonable probability that a parent will not remedy the conditions justifying a child's removal from the home, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing. *Rowlett,* 841 N.E.2d at 621. The trial court must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *C.T. v. Marion Cnty. Dep't. of Child Servs.,* 896 N.E.2d 571, 578 (Ind. Ct. App. 2008), *trans. denied.* DCS is not required to rule out all possibilities of change; rather, it need only establish "that there is a reasonable probability that the parent's behavior will not change." *Id.* (quoting *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007)). Moreover, the trial court may properly consider a parent's criminal history, drug and alcohol abuse, historical failure to provide support, and lack of adequate housing and employment. *Matter of D.G.,* 702 N.E.2d 777, 779 (Ind. Ct. App. 1998).

In support of her argument that DCS presented insufficient evidence to support the trial court's termination of parental rights, Mother focuses on several specific findings and the trial court's overall conclusion of unchanged conditions. We will discuss each allegation in turn.

### I. *Safety Plan Finding*

In finding #6, the trial court succinctly stated that "Mother violated the safety plan." (Appellant's App p. 5). Mother now alleges that DCS failed to prove "any

violation" of the safety plan. (Appellant's Br. p. 9). We disagree. The record reflects that the safety plan, agreed to by Mother on July 7, 2012, included a provision that she would "discipline [E.H.] in a safe manner, leaving no bruises or marks." (DCS's Exh. 3, p. 1). FCM Carmer testified that when she returned the following week, she observed "a bruise on [E.H.'s] bottom." (Tr. p. 29). As such, the trial court properly found that the safety plan was violated.

## II. *Bruise in Shape of Finger*

Closely related to her first argument, Mother next contends that the trial court mischaracterized the evidence in its finding #11, which states, "[a]t removal, [E.H.] had bruises under his diaper from being hit and bruises in the shape of finger marks. A full body scan did not reveal broken bones." (Appellant's App. p. 6). Mother now asserts that while the bruising on E.H.'s bottom was described as small and light brown, "there was no evidence that these bruises were a result of the child being hit by Mother" and in fact, she proposes the alternative explanation that E.H. was learning to walk. On cross-examination of FCM Carmer, Mother elicited the testimony that the FCM was concerned about the "new" bruise because it didn't appear to her that the bruise "would just be there without someone hitting him and putting it there." (Tr. p. 51). She described the bruise as a "long bruise" which "looks like a finger." (Tr. p. 52). She testified that, at that time, E.H. was still wearing a diaper which would have given the child extra "padding." (Tr. p. 51). FCM Carmer also clarified that she never saw E.H. walk. Based on the record, we conclude that finding #11 was properly supported by sufficient evidence.

12

### III. *Participation in Services*

Next, Mother disputes the trial court's finding #28, which found that "Mother last participated in services on May 1, 2013 because of her arrest. She participated in individual counseling for one (1) month." (Appellant's App. p. 7). In support, Mother refers to her testimony during which she told the trial court that she continued to participate in services during her incarceration. Specifically, Mother stated that she had participated in anger management and financial peace and planned to participate in services offered by the Indiana Department of Correction (DOC) but was still on intake status and unable to enroll.

The record clearly supports that Mother discontinued all services offered by the DCS on May 1, 2013 because she became incarcerated. While the findings prior to finding #28 summarize Mother's interaction with the DCS, finding #29 and subsequent enumerated findings detail Mother's criminal history and her conduct at the DOC. As such, finding #28 represents the transition from DCS to DOC and the trial court properly found that Mother's services with DCS ended May 1, 2013.

### IV. *Changed Conditions*

Turning to the trial court's conclusion, Mother contends that the evidence reveals that her circumstances and habitual pattern of conduct have changed such that she now understands the importance of being a good parent, recognizes the need for medication, and is willing to participate in services.

At the time of the termination hearing, the DCS presented evidence indicating that since E.H.'s removal, Mother had participated in services aimed at reunification with her child. However, testimony revealed that her participation was sporadic at best: she missed appointments, and when she did attend, she became argumentative and was inattentive. At the hearing Mother testified that while she had enrolled in anger management classes, she did not "need" the classes but chose to take them nonetheless. (Tr. p. 256).

Although she visited E.H. from July 2012 until her incarceration on May 1, 2013, these visits never progressed beyond the supervised stage as several problems surfaced. Mother continued to insist on corporal punishment of E.H. even when asked to stop. When it was pointed out to her that "hitting was not allowed," she became verbally abusive. (Tr. p. 142). Even Mother's child-rearing philosophies remain questionable as she attempted to teach E.H. about fire by letting him play with burning candles.

The record further demonstrates that despite the recommendation by Mother's psychiatric and psychological evaluations to continue her medication and to learn more coping skills, Mother was not very diligent in her compliance. She only participated in one month of individual therapy sessions and her progress in "positive parenting interactions" was "inconsistent." (Tr. p. 173). At the hearing she admitted to not always take her medication, preferring to "just let God handle it." (Tr. p. 263). Mother continued to utter suicidal threats: on February 19, 2013, she told a service provider that

she planned to commit suicide if she "didn't get [E.H.] back by May and if [she went] to jail." (Tr. p. 154).

Although Mother assured the trial court that she could provide E.H. with a good role model, Mother continued to incur criminal charges during the pendency of the case. Even while incarcerated, she was involved in several altercations which resulted in a reduction of her accumulated good behavior time.

Despite Mother's testimony of her future plans to attend services while incarcerated, to live with her parents, and to participate in DCS provided services once released, the trial court did not have to take these intentions into account. *See In re B.D.J.*, 728 N.E.2d 195, 202 n.1 (Ind. Ct. App. 2000) (A parent's "future plans were not evidence on which the trial court could base its opinion.").

In sum, the record before us lacks any evidence indicating that the conditions which led to E.H.'s removal have changed, let alone that there is a reasonable probability that Mother's situation will change. Likewise, Mother's habitual pattern of conduct fails to show any personal growth in any area of her life; instead she persists in continuing a life of crime and exhibits an unwillingness to deal with the parenting problems that resulted in the removal in the first place. We affirm the trial court's conclusion.[2]

## CONCLUSION

Based on the foregoing, we conclude that the trial court's findings were sufficient to support its decision to terminate Mother's parental rights to her minor child.

---

[2] Mother did not appeal the trial court's conclusion that termination is in E.H.'s best interest.

Affirmed.

MATHIAS, J. and CRONE, J. concur