**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 24 2013, 8:52 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STEVEN KNECHT**
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**CHARLES M. CROUSE**
Franklfort, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) |
| J.N. (Minor Child), | ) ) |
| AND | ) ) |
| JE.N. (Father), | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 08A02-1212-JT-1010 ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE CARROLL SUPERIOR COURT
The Honorable Julian L. Ridlen, Senior Judge
Cause No. 08D01-1208-JT-4

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, J.N. (Father), appeals the trial court's termination of his parental rights to his minor child, J.N.

We affirm.

ISSUES

Father raises three issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the State presented sufficient evidence to conclude that there was a reasonable probability that continuation of the parent-child relationship posed a threat to J.N.; and

(2) Whether termination of Father's parental rights was in J.N.'s best interests.

FACTS AND PROCEDURAL HISTORY

J.N. is the son of Father and C.C. (Mother). On December 8, 2009, J.N. was born prematurely in Jacksonville, Florida. Father admitted to paternity. As J.N. tested positive for drugs, morphine was administered to him for the next twenty days to wean him off. On April 22, 2010, following their move to Indiana, Father and Mother were both arrested for domestic violence. J.N. was given by Mother to a family friend. Investigating a report of suspected abuse, a Department of Child Services (DCS) Family

Case Manager, Darrell Noonkester (FCM Noonkester), contacted Father at the Carroll County Jail. Father disclosed that he and Mother had been in an argument. Mother had also been incarcerated but was released soon after. Subsequently, police received a report that Mother possessed controlled substances. On April 24, 2010, Mother was stopped while driving with J.N. in the car and arrested for possession of controlled substances. With the help of the police, Mother placed J.N. with a family friend. On April 29, 2010, however, the friend contacted DCS which took J.N. into custody thereafter.

On May 3, 2010, DCS filed its verified petition alleging that J.N. was a child in need of services (CHINS). That same day, the trial court held a detention and initial hearing on the CHINS petition at which both Father and Mother appeared. The trial court ordered J.N.'s placement in foster care. Father remained incarcerated during this time and Robert Haywood (FCM Haywood) was assigned as Father and Mother's case manager. FCM Haywood interviewed Father in jail and ordered a mental health assessment. Later, FCM Haywood worked with Father on parenting skills through the Fatherhood Initiative program. Thereafter, Heather Govert (FCM Govert) acted as the case manager.

On June 3, 2010, the trial court held a CHINS fact-finding hearing. Father and Mother appeared and stipulated that both were incarcerated and unable to care for the child. The trial court adjudicated J.N. to be a CHINS. On July 1, 2010, the trial court entered its dispositional order, ordering both parents to comply with the terms of their

criminal cases, to complete substance abuse treatments and evaluations, to complete mental health evaluations, to secure and maintain adequate housing, to address their domestic violence issues through counseling, to refrain from drug and alcohol use, and to visit J.N. as scheduled.

On July 22, 2010, Father was released from jail and moved to a halfway house for two months. From August to December 2010, Father had nine supervised visits with J.N. but missed eight visits.[1] Father was told to bring diapers and food to at least some visits but did not do so. During the visits, Father did not interact sufficiently with the child and during later visits listened to music while paying attention to the child. Father also participated in an intensive outpatient program (IOP) for his substance abuse issues but did not complete the program. Father was incarcerated for public intoxication and imprisoned from September 6 to September 20, 2010.

On December 9, 2010, the trial court held a periodic review hearing at which Father appeared. The trial court found that Father had not enhanced his ability to fulfill his parental obligations, failed to cooperate with DCS, and the reasons for J.N.'s placement outside of the home had not been remedied. On January 1, 2011, Father was hospitalized for slitting his wrist, ostensibly done to remove a tattoo bearing Mother's name.

---

[1] In its Order terminating Father's parental rights to J.N., the trial court cited testimony from a case manager, Shawna Yoder (Yoder), to find that Father had fifteen visits with J.N. from August 2010 to December 2010. However, Yoder testified that Father had nine visits with J.N. from August 2010 to December 2010, while Mother had six visits with J.N. during the same period.

Between January 2011 and April 2011, Father continued his visits with J.N. and underwent his second IOP and completed eight weeks of treatment. On March 20, 2011, Father was arrested for operating a motor vehicle while intoxicated (OWI). Father used alcohol to relieve stress and felt at the time that too much was being asked of him.

On April 1, 2011, the parents had their last visit with J.N., which was also the last time Father saw FCM Govert. Thereafter, Father and Mother moved to Virginia so that Father could obtain work. In May 2011, Mother called FCM Govert to inform her that Father had been convicted and incarcerated on theft and fraud charges. Father has not seen J.N. since moving to Virginia and has been incarcerated ever since.

On August 2, 2012, the State filed its verified petition to terminate Father and Mother's parental rights to J.N. The petition alleged that J.N. had been removed from the parents for at least six months pursuant to a dispositional order, that continuation of the parent-child relationship posed a threat to J.N.'s well-being, that termination was in the best interests of J.N., and that there was a satisfactory plan for the care and treatment of J.N.

On November 2, 2012, the trial court held an evidentiary hearing. FCM Govert testified that J.N., now three years old, is a special needs child who has been diagnosed with hyperlexia, hypotonia, nystagmus, and a chromosomal defect. As a result, J.N. frequently visits Riley Children's Hospital in Indianapolis, Indiana for examination and therapy. FCM Govert believed that Father had continually put himself in situations

where he could not care for J.N., refused to address his substance abuse issues, and has not and could not provide stability and permanency for J.N.

Mother also gave testimony via telephone from a correctional institution in Florida. Mother admitted that she could not care for the child and wanted to voluntarily relinquish her parental rights to J.N. Mother preferred that J.N. be adopted by his foster parents but believed that Father could care for the child. Father testified that he planned to find employment following his release from incarceration, to live with his father and step-mother in Ohio, and rely on their assistance to provide for J.N.'s needs. Father's criminal history included active warrants for his arrest in Colorado, Georgia, and Florida. Although Father wanted to deal with these matters, his strategy was to avoid going to those states in the interim. On November 20, 2012, the trial court issued its Order, terminating Father's parental rights to J.N.

Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

On appeal, Father contests the sufficiency of the evidence supporting the termination of his parental rights. Specifically, Father asserts that the State failed to prove by clear and convincing evidence that there was a reasonable probability that continuation of the parent-child relationship posed a threat to J.N.'s well-being. Father additionally contends that the evidence was insufficient to prove that termination was in the best interests of J.N.

### I. *Standard of Review*

6

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re J.S.O.*, 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. *Id*. However, the trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination of a parent-child relationship. *In re J.H.*, 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), *trans. denied*. Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id*.

In reviewing termination proceedings on appeal, this court will not reweigh the evidence nor assess the credibility of the witnesses. *Id*. We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id*. Where, as here, the trial court enters findings of fact and conclusions of law in its termination of parental rights, our standard of review is two-tiered. *Id*. First, we determine whether the evidence supports the findings, and second, whether the findings support the conclusions of law. *Id*. In deference to the trial court's unique position to assess the evidence, we set aside its findings and the judgment terminating the parent-child relationship only if they are clearly erroneous. *See id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the conclusions of law drawn by the trial court are

7

not supported by its findings of fact or the conclusions of law do not support the judgment. *Id.*

## II. *Analysis*

### A. *Threat to Well-Being*

To involuntarily terminate parental rights, the State must allege and prove, among other things, the following by clear and convincing evidence:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. […]

(C) [and] that termination is in the best interests of the child.

Ind. Code § 31-35-2-4(b)(2)(B), -(C). Clear and convincing evidence as a standard of proof requires the existence of a fact to "be highly probable." *Hardy v. Hardy*, 910 N.E.2d 851, 859 (Ind. Ct. App. 2009). It need not reveal that the parent's continued custody is wholly inadequate for the child's survival. *See Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 148 (Ind. 2005). Rather, it is sufficient to show that the child's emotional and physical development is threatened by the parent's custody. *See id.*

In concluding that continuation of Father's relationship with J.N. posed a threat to J.N.'s well-being,[2] the trial court found that:

> 6. [DCS] became involved with the family on April 29, 2010, when […] a friend of [Mother] called [DCS] to come get the child as both parents were incarcerated and the family could not care for four (4) month old [J.N.]. [J.N.] was placed in foster care on April 29, 2010, and he has not returned home since that time. […].

[* * *]

> 10. [FCM] Haywood testified that there was no compliance with the court orders as [Father] refused to cooperate in jail. […].

> 11. […]. [Mother] testified to the court that [J.N.] was born drug positive in Jacksonville, Florida, and he was kept [three] weeks in the hospital where he was given morphine to wean him off of drugs. She further admitted that he had breathing problems and eye problems. Father later testified they were not sure that little [J.N.] would survive.

[* * *]

> 15. [FCM Govert] testified that she had taken over the case as ongoing worker from [FCM Haywood] in the month of August[] 2010. When she started, [Father] had just been released from the Carroll County Jail […].

[* * *]

> 18. [FCM Govert] testified that the parental rights of [Father] should be terminated due to a failure to complete any goals of the case plan and for absenting himself from the [S]tate of Indiana and failing to visit his child for [19] months.

---

[2] Father argues that the trial court violated his due process rights by stating in its Order that there was a "reasonable possibility," rather than a reasonable probability that continuation of the parent-child relationship posed a threat to J.N. (Appellant's App. p. 26). However, we conclude that this is a scrivener's error. *See McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199-200 (Ind. Ct. App. 2003).

19. [FCM Govert] testified that [Father] had a problem with domestic violence and an abuse of alcohol and that the two were probably related. She testified that [Father] had twice failed to complete IOP, once at Wabash Valley in Delphi[, Indiana] in 2010 and once at Wabash Valley in Monticello[, Indiana] in 2011. He failed to keep appointments the first time. The second time, he completed part of the IOP. He moved into the Lighthouse Recovery half-way house for drugs and alcohol. He left that facility, but was arrested and jailed in Monticello for public intoxication in September 2010. He completed part of the IOP in Monticello. He was set to start the Relapse Prevention portion of the program on March 23, 2011 when he was arrested for [OWI] in Monticello on March 20, 2011. He failed to notify his case manager at Wabash Valley or his [FCM] of this arrest on March 20, 2010. On cross examination of [Father,] he admitted to being convicted of both crimes and failing to report the OWI to his FCM.

20. Shawna Yoder of Wabash Valley testified concerning visits from August through December 2010. Father made 15 visits and cancelled [eight] times. He started out somewhat attentive to [J.N.], but later became detached and had head phones like for a MP3 player, and he paid less attention to [J.N.]. He failed to bring diapers or food for [J.N.], although he was told by Shawna Yoder to do so. This is to show that [F]ather can handle the child in real life situations. On cross examination, [F]ather denied ever being told this and accused the case manager of perjury. […].

21. Tara Sprinkle, Wabash Valley case manager from White County[, Indiana], testified that she did some parenting education, attempted budgeting, and supervised visitation from January 2011 to April 1, 2011, when she never heard from the parents again. She stated that she could not work on budgeting even though father had employment and money problems because Father was "secretive." Although the parents did visit during this period, [Tara] Sprinkle testified that the child would cry all the time, sometimes for an hour at a time. She also overheard a conversation between the parents and [J.N.]. She characterized this as a good-bye where the parents were telling [J.N.] good-bye. She stated that the parents had no intent to return. Father denied this also and again accused the worker of perjury.

[* * *]

25. […]. [J.N.'s foster mother] described J.N. as having hypertonia, hyperlexia, and comparative genomic hybridization affecting the seventh chromosome. […]. She described the hypotonia as a muscle weakness for

10

which [J.N.] goes to occupational therapy twice a month. She described the autism like symptoms as anything new in his world such as taste, touch, smell, or sounds can set [J.N.] off into a crying fit. She described an eye problem of nystagamus [sic] whereby his eyes "jiggle." […].

[* * *]

29.   Father testified that his relationship with his son was the most important thing in his life. […]. He thought that if he was given one more chance with services, he could be successful. His testimony was that nearly all the case workers on this case had perjured themselves. He did not deny on cross examination that he had an alcohol problem. […]. When asked about the 19 month absence, [F]ather had no real response. […]. [Father] admitted that the parents had only had [J.N.] in their possession for [four] months out of his [three] years of life.

30.   Father appears to have outstanding warrants in three different states, including Florida, Georgia, and Colorado with extradition only from bordering states. Father said that he had an outstanding traffic ticket in Florida. He did have a traffic ticket, but he also had a warrant for theft, [and] may be armed and dangerous. He was also named as a former drug user. […]. [Father's] plan is not to go near those states. [Father] appears to have a long criminal history, and he solves his problems by running away from them until incarcerated.

31.   Father has had opportunities for services for [two and a half] years and failed to complete any of them. [FCM] Govert testified that there were no more services left to offer [F]ather. […]. This is a story of parents who chose drugs and alcohol over their child.

(Appellant's App. pp. 17-25).

Father does not dispute the trial court's findings, other than to argue either that the record contains no evidence that he abused or neglected J.N. or that there were alternate justifications for his behavior. Based on our review of the record, we cannot agree with Father that there was insufficient evidence that there was a reasonable probability that continuation of the parental relationship posed a threat to J.N.'s well-being. J.N. was

11

removed from the home at the age of four months because both parents were incarcerated. After the CHINS process had commenced, Father was arrested for two alcohol-related crimes. Father effectively abandoned his child by moving to Virginia ostensibly to raise money for his legal defense of the OWI charge and probation violation. As a result of such behavior, Father failed to visit J.N. and did not see the child for 19 months prior to the termination hearing. The evidence illustrates that J.N. is a special needs child whose care requires a sufficient level of parental availability and support. Given Father's history of substance abuse, his instability, his abandonment of J.N., and the threat of further incarceration resulting from his outstanding warrants, we conclude that there is ample support for the trial court's findings.

Father also argues that "he will be able to meet J.N.'s needs" since he has done "all that he can in prison to deal with his alcohol problem, and is ready to engage in further services." (Appellant's Br. p. 20). However, the time for parents to rehabilitate themselves is during the CHINS process, prior to the filing of the petition for termination. *Prince v. Dept. of Child Services*, 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007). Although expressing a desire for reunification with J.N., Father has been given multiple opportunities to make that occur, but failed to cooperate with the services offered. Instead, he committed further alcohol-related crimes and abandoned his child by traveling to Virginia, where he was incarcerated yet again. We therefore conclude that the trial

court did not err in finding that there was a reasonable probability that continuation of the parent-child relationship posed a threat to the well-being of J.N.[3]

## B. *Best Interests of the Child*

Father also challenges the sufficiency of evidence supporting the trial court's determination that termination of the parent-child relationship is in J.N.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the State to the totality of the evidence. *See In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001), *trans. denied*. In so doing, the trial court must subordinate the interests of the parents to those of the children involved. *Id.* Recommendations from the caseworker and guardian ad litem that parental rights be terminated support a finding that termination is in the child's best interests. *See McBride*, 798 N.E.2d at 203. Further, "[a] parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied*.

FCM Govert, the guardian ad litem, and J.N.'s foster mother testified that termination of Father's parental rights was in J.N.'s best interests for several reasons. In

---

[3] Because I.C. § 34-35-2-4(b)(2)(B) is written in the disjunctive, the State was only required to prove a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of J.N. *See Prince*, 861 N.E.2d at 1229 n.2. Therefore, we need not address the issue of whether there was a reasonable probability that conditions that resulted in J.N.'s removal would not be remedied.

particular, FCM Govert cited Father's long absence and his failure to complete services. The guardian ad litem cited the same factors. J.N.'s foster mother explained that J.N. had bonded with her and her husband. Moreover, FCM Govert explained the importance of permanency and that further delaying permanency to give Father one more chance would not be fair to J.N.

Father argues that he shares a bond with J.N. based on his kinship, interactions during visitation, and his interest in J.N.'s well-being throughout his incarceration. However, FCM Govert testified that returning J.N. to his Father would be "traumatic" for J.N. and that J.N. needs adults whom he can "count on." (Transcript pp. 59, 66). The guardian ad litem testified that J.N. "doesn't know his biological parents and they don't know him," and further that Father does not know J.N.'s needs and could not care for them even if he did. (Tr. p. 105). In sum, the foregoing evidence supports the trial court's determination that termination of Father's parental rights is in J.N.'s best interests.

## CONCLUSION

Based on the foregoing, we conclude that (1) the State provided sufficient evidence that there was a reasonable probability that continuation of the parent-child relationship posed a threat to J.N.'s well-being; and (2) the trial court did not err in concluding that termination of Father's parental rights was in J.N.'s best interests.

Affirmed.

BRADFORD, J. and BROWN, J. concur