**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 23 2014, 6:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**TIMOTHY E. STUCKY**
Blume Connelly Jordan Stucky & Lauer, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE: THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: ) | |
| ) | |
| S. J. (Minor Child), ) | |
| ) | |
| And ) | |
| ) | |
| D. C. (Father), ) | |
| ) | |
| Appellant-Respondent, ) | |
| ) | |
| vs. ) | No. 02A04-1312-JT-646 |
| ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, ) | |
| ) | |
| Appellee-Petitioner. ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT

**July 23, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, D.C. (Father), appeals the trial court's order terminating his parental rights to his minor child, S.J. (the Child).

We affirm.

ISSUE

Father raises three issues on appeal, which we consolidate and restate as the following single issue: Whether there was sufficient evidence to support the termination of Father's parental rights.

FACTS AND PROCEDURAL HISTORY

Father and Mother[1] are the parents of the Child, born on February 26, 2004. Father and Mother were not living together and it is unclear when they separated. Mother also has three other children from other relationships—a daughter born in January 2003, a son born in November 2005, and a son born in March 2008. In June 2011, the Department of Child Services of Allen County (DCS) inspected the Mother's home in Fort Wayne where the Child and her other siblings lived. On June 10, 2011, DCS filed a petition to have the Child

---

[1] Mother voluntarily terminated her parental rights, she is not a party to this appeal.

declared a Child In Need of Services (CHINS) based on the parties' neglect of the Child. The Child was then removed from Mother's care and was placed in the care of her maternal grandmother (Grandmother).

On June 21, 2011, a preliminary inquiry was conducted and the trial court found probable cause to believe that the Child was CHINS. On July 18, 2011, the trial court held a dispositional hearing on DCS's CHINS petition. Mother failed to appear, but Father appeared and elected to proceed without the assistance of counsel. Father admitted that: (1) while in Grandmother's care, the Child would call him and tell him she is hungry; (2) while in Grandmother's and Mother's care, he observed the Child being on the balcony, unsupervised; (3) the Child lacked appropriate bedding or clothes; (4) the Child was dirty and unclean; (5) he had a confrontational relationship with Mother; (6) he was unable to provide a safe and stable home for the Child; (7) he had been convicted in 2007 for possession of a controlled substance, and in 2001 for receiving stolen property; and (8) was on arrears on his child support payments.

Based on Father's admission, the trial court adjudicated the Child to be a CHINS and entered a Dispositional Order along with a parent participation plan. Under the parent participation plan, Father was required to refrain from criminal activities, maintain a clean residence, provide clothing for the Child, and to undergo a psychological evaluation. The Dispositional Order further provided that Father must cooperate with DCS and all court-ordered service providers. As for the placement of the Child, the trial court ordered the Child to remain in Grandmother's care.

On December 1, 2011, the trial court conducted a review hearing where it found that Father had not maintained contact with DCS, failed to complete a psychological assessment, did not visit regularly with the Child, and did not demonstrate an ability to benefit from the court-ordered services. Based on Father's noncompliance, the trial court continued placement of the Child with Grandmother.

In January 2012, Annette Meadows (Meadows), a therapist and assessment coordinator at Headwaters Counseling, conducted a psychological evaluation of Father. During the evaluation, Father confessed that while the Child was in his care, Mother or his mother would take care of the Child. Based on that information, Meadows recommended supervised visits so as to monitor Father's interaction with the Child and, if necessary, Father was to attend parenting classes to enable him to relate appropriately to the Child.

Subsequent permanency review hearings were held on April 30, and October 3, 2012. At both hearings, the trial court found that Father had not maintained contact with DCS, regularly visited the Child, or participated in any of the court-ordered services. The trial court therefore continued placement of the Child with Grandmother.

On March 20, 2013, the trial court held a permanency review hearing where it found that Father had shown some progress. Father had regularly visited the Child and had enrolled and was participating in court-ordered services. However, Father had not fully completed the services, and based on that fact, the trial court ordered continued placement of the Child with Grandmother and it authorized DCS to file a petition terminating Father's parental rights.

A two-day termination hearing was held on September 4-5, 2013. Father, who was then incarcerated in the Department of Correction for two-and-half years for possession of marijuana and resisting law enforcement, was represented by counsel and appeared telephonically. During the hearing, DCS presented evidence that Father had been incarcerated during the pendency of the CHINS proceedings. Evidence was also introduced that Father had failed to successfully complete the stipulated court-ordered services; failed to maintain contact with DCS; had been unable to provide the Child with a safe and stable home; and had failed to maintain regular visits with the Child. At the conclusion of the termination hearing, the trial court took the matter under advisement. On December 3, 2013, the trial court granted DCS' petition and terminated Father's parental rights.

Father now appeals. Additional information will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

In reviewing termination proceedings on appeal, this court must not reweigh the evidence nor assess the credibility of the witnesses. *In re J.H.*, 911 N.E.2d 69, 73 (Ind. Ct. App. 2009) *trans. denied*. We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id*. Where, as here, the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id*. First, we determine whether the evidence supports the findings, and second, whether the findings support the conclusions of law. *Id*. In deference to the trial court's position to

5

assess the evidence, we set aside the trial court's findings and judgment terminating the parent-child relationship only if they are clearly erroneous. *Id*.

## II. *Termination of Parental Rights*

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re J.S.O.*, 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. *Id*. However, the trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination of a parent-child relationship. *In re J.H.* 911 N.E.2d *at* 73. Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id*.

In order to terminate Father's parental rights, DCS was required to prove by clear and convincing evidence:

> (B) that one of the following [was] true:
> > (i) There [was] a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents [would] not be remedied; or
> > (ii) There [was] a reasonable probability that the continuation of the parent-child relationship [posed] a threat to the well-being of the child;
> (C) that termination [was] in the best interests of the child.

Ind. Code § 31-35-2-4(b)(2)(B)-(C)[2]; *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). Clear and convincing evidence as a standard of proof requires

---

[2] We observe that I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive. Thus, a trial court need only find that one of the two requirements of subsection (b)(2)(B) has been established by clear and convincing evidence to properly terminate parental rights. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999). Because we find it to be dispositive under the facts of this case, we only consider whether DCS established, by clear and convincing evidence,

6

the existence of a fact to "be highly probable." *Hardy v. Hardy*, 910 N.E.2d 851, 859 (Ind. Ct. App. 2009). It need not reveal that "the continued custody of the parent [] is wholly inadequate for the child's very survival." *Bester*, 839 N.E.2d at 148 (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1233 (Ind.1992)). Rather, it is sufficient to show that the child's emotional and physical development are threatened by the parent's custody. *Id.*

### A. *Conditions Leading to the Child's Removal*

Father first argues that DCS failed to show by clear and convincing evidence that the conditions leading to the Child's removal would not be remedied. In particular, Father argues that "Mother's shortcomings as a parent" was the basis for the Child's removal, and that fact alone "cannot properly be utilized" to support the trial court's determination that conditions leading to the Child's removal would not be remedied. (Appellant's Br. p. 11). We disagree.

When determining whether there is a reasonable probability that a parent will not remedy the conditions justifying a child's removal from the home, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing. *Rowlett v. Vanderburgh Cnty. Office of Family and Children,* 841 N.E.2d 615, 621 (Ind. Ct. App. 2006). The trial court must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *C.T. v. Marion Cnty. Dept. of Child Servs.*, 896 N.E.2d 571, 578 (Ind. Ct. App. 2008), *trans.*

---

that there was a reasonable probability that the conditions resulting in the Child's removal or continued placement outside of Father's care would not be remedied.

7

*denied.* DCS is not required to rule out all possibilities of change; rather, it need only establish "that there is a reasonable probability that the parent's behavior will not change." *Id.* (quoting *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007)). Moreover, the trial court may properly consider a parent's criminal history, drug and alcohol abuse, historical failure to provide support, and lack of adequate housing and employment. *Matter of D.G.,* 702 N.E.2d 777, 779 (Ind. Ct. App. 1998).

First, we note that although Mother's actions caused DCS to file a petition to adjudicate the Child as CHINS, DCS also cited Father's conduct as a reason for the Child's removal. At the dispositional hearing, Father admitted to all the allegations, and his admissions were the basis for the CHINS adjudication. At the termination hearing, the trial court found that there was reasonable probability that the conditions will not improve. The trial court identified the several failed attempts at reunification, irregular visits, Father's incarceration, and Father's inability to maintain a safe and stable home as crucial to its conclusion.

Father is currently incarcerated with his earliest release date scheduled for October 2014; thus, he is currently unavailable to parent the Child. Prior to his incarceration, Father was barely present in the Child's life, and he described his relationship with the Child as "off and on." (Transcript p. 149). Once the CHINS proceedings were initiated in July 2011, Father visited the Child for the first six months but he abruptly stopped the visits. He then resumed the visits in September 2012. At the permanency hearing held on March 20, 2013, Father showed some progress. He had enrolled in the parent participation plan and was regularly visiting the Child. However, the visits stopped in June 2013 when he was arrested

8

for drug possession and resisting law enforcement. Whenever Father would stop his visits, the Child was disappointed. The trial court found that Father's irregular visits had a negative impact on the Child's mental and emotional well-being. In addition, Father has not contacted the Child since he was incarcerated.

Although Father maintained a clean home for three years prior to his incarceration, and had allowed for unannounced visits, DCS did not place the Child with the Father because Father's live-in girlfriend had a criminal record. Hinged on that, Father's home was disqualified for placement. At the termination hearing, the court-appointed special advocate (CASA), Suzanne Lange, testified that she had explained to Father that in order to allow for placement, he needed to remedy that disqualification. The record reveals that Father failed to heed her advice. Instead of breaking up with his girlfriend during the CHINS proceedings, he broke up with her after he was incarcerated, and the termination proceedings were concluding. We find Father's actions are not reflective of a parent who wished to be reunited with his child.

This court has repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Although expressing a desire to be reunited with his Child, Father was given the opportunity to make that happen. However, Father chose not to cooperate with the court-ordered services. He instead continued his life of crime and became incarcerated, thus making him further unavailable to parent the Child. . Also, there is no

9

guarantee that Father will be a suitable parent upon his release. Father will still be required to complete certain services offered by DCS, which he has been unable to complete to date.

In sum, the evidence establishes that Father has not shown a willingness or ability to alter the conditions that led to the Child's removal. Father had ample time, opportunity, and assistance to remedy the conditions, and it is well-settled that a court does not have to wait for a child to become "irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired" before it can terminate the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Under these circumstances, we cannot say that the trial court erred in determining that DCS established that it is unlikely that the conditions resulting in the Child's removal would not be remedied.

### B. *Best Interest of the Child.*

Lastly, Father argues he was "readily available" and since he had approved the placement of the Child with Grandmother, there was "no need to sever the parent-child relationship in order to protect the [Child's] best interest." (Appellant's Br. p. 17).

In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id*. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do the same, supports a finding that termination of

parental rights is in the best interest of the child. *Lang v. Starke Cnty. Office of Family &*
*Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007).

At the termination hearing, the family case manager, Beverly Marcus (FCM Marcus), described Father's compliance with the Dispositional Order as "mediocre." (Tr. p. 66). FCM Marcus testified that Father had failed to maintain regular visits with the Child or maintain regular communication with her. Not once did Father call in and report his status; instead, FCM Marcus had to call him to inquire about his employment and his whereabouts. Similarly, the CASA recommended termination of Father's parental rights based on the fact that Father was unable to follow through with his court-ordered services, had failed to maintain regular visits with the Child, he had engaged in further criminal activity, he had a live-in girlfriend who had a criminal history, and he had been unable to provide a safe and stable home for the Child. Also, the court appointed Guardian *Ad Litem,* Roberta Renbarger, testified that Father was not prepared to take on the responsibility of being a parent to the Child, and he did not have a stable home.

In terminating Father's parental rights, the trial court entered the following finding

5. Termination of parental rights is in the best interest of the [C]hild [], in that [F]ather [] has shown over the course of the related CHINS cause, [] is unable [] to provide basic necessities of a suitable home for raising the [C]hild. . . .

During the underlying CHINS proceeding, [F]ather [] did not maintain regular or consistent contact with the DCS family case manager. . . .

[The Child] is nine years old and has been diagnosed with anxiety and has anger management problems. She has recently been prescribed medication for her diagnosis and is participating in counseling at Park Center. The [C]hild has been in the [Grandmother's] home since the initiation of the

11

CHINS proceedings []. Prior to the initiation of the CHINS proceedings, [] [F]ather [] had consistent [visits] with the [C]hild [which] occurred [twice monthly]. Once the underlying CHINS proceedings began, [Father's] visitation with the Child became inconsistent. [Father] visited the [C]hild for approximately 6 months after the proceedings began in 2011. When the visits began [], [the Child] would become upset after the visits, however, [this] behavior subsided as time went on. [F]ather's visits ended after [] six months with no explanation from [him]. The [C]hild was disappointed when the visits ended and later learned from a family member that the visits ended because of [Father's] incarceration. [] [Father's] earliest possible release date is not until October 2014. His [] engagement in criminal activity is having negative impact on the mental/emotional well-being of his child and [his incarceration] significantly interferes with his ability to provide [] basic necessities of a suitable home. . . . Presently, the [Child] is in a stable environment with her [] [G]randmother with whom she has resided with since the initiation of the [CHINS] proceedings. The [C]hild has flourished in [] [G]randmother's home and [] [G]randmother would like to adopt the [C]hild. [The Child] should not be required to wait until her [Father] is released from incarceration in October [] 2014, in order to obtain [a] permanent home. The child's best interest [would] be served by the entry of an order granting the petition for termination of [parental] rights. . .

(Appellant's App. pp. 53-54).

In light of the foregoing, we find that there was a persistent overriding theme throughout the CHINS proceedings—Father was unavailable to parent the Child. Over a span of two years, he had the opportunity to remedy the conditions leading to the Child's removal, which he failed to do. Based on our review of the record, we cannot agree with Father's assertions. The evidence reveals ample support to conclude that it was in the best interest of the Child to terminate Father's parental rights.

## CONCLUSION

In conclusion, we find that the trial court did not err by terminating Father's parental rights to his minor child.

Affirmed.

ROBB, J. and BRADFORD, J. concur