## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 09 2016, 8:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT I.P.

Jennifer A. Joas
Madison, Indiana

ATTORNEY FOR APPELLANT B.P.

R. Patrick Magrath
Alcron Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of L.P. and B.C., <br><br> B.P. and I.P. <br><br> *Appellants-Respondents,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | February 9, 2016 <br><br> Court of Appeals Case No. 40A04-1507-JT-868 <br><br> Appeal from the Jennings Circuit Court <br><br> The Honorable Jon W. Webster, Judge <br><br> Trial Court Cause No. 40C01-1401-JT-5 40C01-1401-JT-6 |

**Bradford, Judge.**

# Case Summary

[1]     Appellants-Respondents, I.P. ("Father") and B.P. ("Mother") (collectively "Parents"), separately appeal the trial court's order terminating their parental rights to L.P.  Mother also appeals the trial court's order terminating her parental rights to B.C.[1]  On February 11, 2011, Appellee-Petitioner, the Department of Child Services ("DCS"), filed a petition alleging that the Children were children in need of services ("CHINS").  The Children were subsequently determined to be CHINS.  On January 31, 2014, DCS filed a petition seeking the termination of parental rights ("TPR").  Following an evidentiary hearing, the trial court issued an order terminating Parents' parental rights to the Children.  On appeal, Parents argue that DCS did not provide sufficient evidence to support the termination of their parental rights and Father contends that the trial court failed to advise him of his right to counsel.  We affirm.

# Facts and Procedural History

[2]     Mother and Father are the biological parents of L.P., who was born on January 18, 2011.  Mother is the biological mother of B.C., who was born on October 18, 2007.[2]  On February 4, 2011, the DCS received a report that L.P. had tested

---

[1] L.P. and B.C. will be referred to collectively as "the Children."

[2] B.C.'s father is not a party to this matter.

positive for morphine. Mother admitted to DCS that she used opiates, specifically morphine, without a prescription, and the trial court ordered the Children's emergency removal on February 10, 2011. The Children were placed with their maternal aunt, A.B. ("Aunt"), and her husband, W.B. ("Uncle"). Aunt estimated that prior to DCS's involvement, she and her husband took care of the Children "a good 75 percent" of the time. Tr. p. 235. On February 11, 2011, DCS filed a petition alleging that the Children were CHINS and, on the same day, the trial court held an initial hearing and declared the Children to be CHINS. Father was not present at the initial hearing because he was incarcerated at the time after violating his probation for a prior misdemeanor battery conviction.

[3] The Children were scheduled to be returned to Parents on March 30, 2011 for a trial home visit, but their return was stayed after the trial court received an email from the provider of Mother's outpatient substance abuse program regarding suspected domestic violence by Father. As a result, the trial court recommended that Parents participate in individual therapy and couples counseling. Parents denied any physical abuse but acknowledged that they argued frequently.

[4] On April 21, 2011, the Children returned to live with Parents for an initial trial home visit. The Children were removed on May 31, 2011 due to ongoing concerns regarding Mother's drug use. On June 14, 2011, the trial court held a dispositional hearing at which Parents were present and issued its dispositional order on July 27, 2011. The order provided that the Children were removed

from Mother's care, DCS was granted wardship of the child, and Parents were ordered to maintain contact with the Family Case Manager ("FCM"). The trial court also ordered Parents to obtain suitable housing and a stable source of income; abstain from illegal substance use; complete a substance abuse assessment, a psychological evaluation, and a parenting assessment and follow all recommendations; submit to random drug tests; attend supervised visitations; and provide the Children with a safe, secure, nurturing environment.

[5] Parents completed an intensive outpatient substance abuse program ("IOP") in August 2011 and continued to undergo individual therapy and couples counseling. The Children were again returned to Parents for a trial home visit on October 14, 2011. On January 30, 2012, the Children were removed from Mother's care, again due to concerns regarding drug use, and placed in the sole care of Father. At the May 25, 2012 review hearing, the trial court found that (1) since completing the August 2011 IOP, Parents had refused substance abuse treatment, (2) Parents had "not enhanced their ability to fulfill their parental obligations," and (3) Parents had not cooperated with DCS. Petitioner's Ex. 1H for L.P.

[6] On October 1, 2012, during a home visit, B.C. told FCM Kristen Sparks about an instance of physical abuse in which Father pulled L.P. out of his chair by his hair and dragged him across the floor, also by his hair. B.C. also reported that Father slapped her and hit Mother. Father denies any instances of physically

abusing the Children, although he admitted to "losing it" at times and failing to take medications at prescribed times. DCS Ex. 18.

[7] The trial court held permanency hearings on August 15, and November 4, 2013, for B.C. and L.P. respectively. In its subsequent orders, the trial court found that Parents had failed to comply with the Children's case plan, failed to participate in services, had not visited the Children, had not cooperated with DCS, had moved out of the county; that Mother was arrested in 2012 and failed to inform the FCM; and that Mother failed to maintain stable employment. As a result, the trial court changed the permanency plan for the Children from reunification to adoption. The DCS filed a petition to terminate the parent-child relationships on January 31, 2014.

[8] On February 13, 2014, Father was arrested after police were called regarding an altercation between Mother and Father. When police arrived at Parents' home, they found Father on top of Mother pinning her to the bed with his arms and legs. Father was "aggravated and intoxicated," resisted police, and had to be subdued with a taser. Tr. p. 5. Mother was pregnant with S.P.[3] at the time of the altercation. Father pled guilty to three counts of battery and was given a two-and-a-half-year sentence with six months executed and the remaining two years on probation.

---

[3] S.P. was born on April 2, 2014 and is the biological child of Parents. S.P. was adjudicated to be a CHINS in a separate case on October 21, 2014 and Parents did not have custody of S.P. at the time of the termination hearing in this case. Parents' parental rights regarding S.P. are not at issue in this appeal.

[9] Throughout the CHINS proceedings, Parents intermittently participated in the recommended counseling and substance abuse treatment programs. Father completed his initial IOP but did not follow up with recommendations to continue with AA or NA. Although Father never failed a drug screen, he refused to take five screens, which were considered to be positive tests. Father admits that he was only minimally compliant with individual counseling and was unable or unwilling to address providers' concerns which were brought to his attention.

[10] While undergoing treatment for substance abuse, Mother admitted to using amphetamines, marijuana, spice, and morphine. Mother "never acknowledged that she had a problem with drugs." Tr. p. 21. Although Mother never failed a drug screen, she refused to take seven drug screens over the life of the case. When S.P. was born in April 2014, S.P. tested positive for marijuana and opiates, indicating that Mother had again ingested opiates while pregnant. Mother's participation in therapy was "sporadic" and "very inconsistent." Tr. p. 264.

[11] At a permanency hearing held on April 25, 2014, the trial court found that it was in the Children's best interest to continue with the permanency plan to terminate the Parents' parental rights and place the Children for adoption. In making this determination, the trial court noted that Mother had not complied with the Children's case plan, had not attended therapy consistently, had last attended therapy on October 10, 2013, had only visited the Children on five occasions between the August 2013 and the April 2014 hearings, and had not

maintained her sobriety. With regards to Father, the trial court found that he had not attended therapy since October 10, 2013, was inconsistent with services, had visited L.P. only once between the August 2013 and the April 2014 hearings, continued to have legal issues, and was convicted of multiple battery charges for the February 2014 incident.

[12] On August 26, 2014, Father pled guilty to Class A misdemeanor invasion of privacy. In January 2015, Father's probation was revoked after he violated the conditions of his probation for, among other things, failure to report, failure to maintain employment, and testing positive for hydrocodone without a valid prescription. As of the June 9, 2015 termination order, Father had been incarcerated since January 20, 2015.

[13] The trial court held termination hearings on January 27, April 14, and May 12, 2015. After a thorough recitation of the facts underlying the case, the trial court found that termination of parental rights is in the Children's best interests. Accordingly, the trial court terminated Parents' parental rights over L.P. and Mother's parental rights over B.C. As of the date of the termination order, the Children lived with Aunt and Uncle, and have lived there since February 2, 2012. Based on the testimony of FCM Sparks, the trial court found that the Children are well-adjusted in Aunt and Uncle's home and they are willing to adopt the Children.

# Discussion and Decision

# Standard of Review

[14] The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his or her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

[15] The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[16] Parents contend that the evidence presented at the evidentiary hearing was insufficient to support the trial court's order terminating their parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination*

*of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the trial court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*. We note that Parents have not challenged the trial court's factual findings and instead challenge only the trial court's legal conclusions.

[17] In deference to the trial court's unique position to assess the evidence, we set aside the trial court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the legal conclusions made by the trial court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id*.

[18] In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
>
> > (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
> >
> > (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description

of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)  that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)  termination is in the best interests of the child; and

(D)  there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011). Parents do not dispute that DCS presented sufficient evidence to support the first and fourth elements set forth in Indiana Code section 31-35-2-4(b)(2).  Parents, however, argue that DCS failed to establish either that (1) there is a reasonable probability that the conditions that resulted in the Children's removal from or the reasons for the Children's continued placement outside of their home will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child relationship

poses a threat to the well-being of the Children.  Father also argues that DCS failed to establish that termination is in L.P's best interest.

# I. Conditions Resulting in Removal Not Likely to Be Remedied

[19] On appeal, Parents argue that DCS failed to establish by clear and convincing evidence that the conditions resulting in the Children's removal from and continued placement outside their care will not be remedied.  Parents also argue that DCS failed to establish by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the Children. However, it is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court need only find *either* that the conditions resulting in removal from or continued placement outside the parent's home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the child.  *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*.  Therefore, where, as here, the trial court concludes that there is a reasonable probability that the conditions which resulted in the removal of the child from or the reasons for the continued placement of the child outside of the parent's care would not be remedied, and there is sufficient evidence in the record supporting the trial court's conclusion, it is not necessary for DCS to prove or for the trial court to find that the continuation of the parent-child relationship poses a threat to the child.  *In re S.P.H.*, 806 N.E.2d at 882.

[20]    In order to determine whether the conditions will be remedied, the trial court should first determine what conditions led DCS to place the Children outside of Parents' care or to continue the Children's placement outside Parents' care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied, the trial court must judge the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The trial court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*.

[21]    A trial court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a trial court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id*. (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re*

*Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[22] Here, the Children were initially removed from Parents' care due to Mother's substance abuse issues. DCS continued to keep Children placed outside of Parents' care due to Parents' domestic violence issues, Father's physical abuse of the Children and Mother, Father's incarceration, Mother's failure to maintain stable employment, and Parents' failure to consistently participate in or benefit from services provided to them. The trial court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for the Children's removal from and continued placement outside of Parents' care would be remedied, and upon review, we conclude that the trial court's determination to this effect is supported by the record.

## A. Reasons for Children's Removal from Mother

[23] The Children were initially removed from Parents' care in 2011 after L.P. tested positive for morphine at birth. With regards to dealing with her substance abuse issues, the trial court ordered Mother to "abstain from illegal substance use; [] complete a substance abuse assessment and follow all recommendations; [] complete a psychological evaluation and follow all recommendations;" and "submit to random drug tests." Mother's App. p. 28. In 2011, DCS twice returned the Children to Parents' care for trial home visits. The first trial home visit, which began in April, ended on May 31, due to continued problems with Mother's drug use. Mother completed an IOP in August 2011 and the Children were returned to Parents for a second trial home visit on October 14, 2011. On

January 30, 2012, the Children were removed from Mother's care, again due to concerns regarding drug use.

[24] At the August 15, 2013 permanency hearing, the trial court changed the permanency plan from reunification to termination as a result of "[M]other's inconsistency attending individual and couples counseling sessions, [M]other's failure to maintain stable employment, [M]other's failure to comply with parent aid classes, and [M]other's refusal to submit to drug screens." Mother's App. p. 29. Despite this order, Mother's participation in therapy was "sporadic" and "very inconsistent," tr. p. 264, and Mother did not attend a single therapy session in the five months leading up to the April 25, 2014 permanency hearing.

[25] Although Mother never failed a drug screen, she refused to take seven drug screens over the life of the case. As the trial court noted, "Mother was aware that refusal to submit to a drug screen would result in a presumptive positive screen." Mother's App. p. 30. Despite her admission to using amphetamines, marijuana, spice, and morphine, Mother "never acknowledged that she had a problem with drugs." Tr. p. 21. As further evidence that Mother failed to address her issues with drug abuse, in April 2014, S.P. tested positive for marijuana and opiates at birth, indicating that Mother had again taken narcotics while pregnant.

[26] In addition to her issues with drugs, the trial court also noted Mother's refusal to acknowledge or address domestic violence issues with Father despite her admission to frequent heated arguments, B.C.'s statements, and the 2014

incident resulting in Father's battery convictions. Parents were ultimately dismissed from couples therapy due to their refusal to address issues and frequent appointment cancellations.

[27] Finally, the trial court noted several areas in which Parents were deficient in providing stability for the Children: Mother obtained and lost three different jobs in the first four months of 2015 and Father had no employment arranged upon his release from incarceration, Mother was unwilling or unable to properly discipline the Children during visits, and Parents regularly failed to properly provide nutritional food and drinks during visits.

## B. Reasons for Children's Removal from Father

[28] In its termination order, the trial court noted that Father has been incarcerated multiple times throughout the life of the underlying CHINS case. Father had two separate convictions for battery in 2010, one as a Class D felony and one Class B misdemeanor. In January of 2011, Father was arrested for violating his probation and served a 140-day sentence. As a result, Father was incarcerated during the period in which L.P. was born, subsequently removed from Mother's care by DCS, and declared a CHINS by the trial court. In 2013, Father received a one-year sentence for Class A misdemeanor possession of paraphernalia and served eight days with the remainder suspended to probation. In February of 2014, Father was arrested after an altercation with Mother for which he was ultimately convicted of Class D felony battery with bodily injury to a law enforcement officer, Class A misdemeanor battery, and Class B misdemeanor battery. Father violated his probation in January of 2015

and, as of the trial court's June 2015 termination order, had been incarcerated since that time.

[29] Father has a total of five battery convictions involving three separate incidents in approximately four years and Father admitted to having trouble controlling his temper. Nevertheless, in the time since DCS became involved, he has failed to sufficiently address or even acknowledge his anger issues or make any significant improvements. In 2012, during a trial home visit, the Children were removed after B.C. told FCM Sparks about incidents in which Father had physically abused L.P., B.C., and Mother. Additionally, the trial court noted that Father was inconsistent with completing therapy, made little to no progress with service providers, never admitted to any instances of domestic abuse despite his plea to committing battery and B.C.'s statements, and refused to address the issue with his therapists. The trial court also noted that Father "demonstrated inconsistency in attendance with his child. From August 2013 until his incarceration on February 13, 2014, Father only visited his child once." Father's App. p. 46.

[30] Parents had four years from the initiation of the underlying CHINS case to the termination proceedings to address their issues with domestic violence, drug abuse, and criminal recidivism. Unfortunately, both Mother and Father failed to do so and have not shown they are capable of providing a consistent and stable home-life for the Children. In light of these findings, the trial court concluded that DCS had established by clear and convincing evidence that the reasons for the Children's removal from and continued placement outside

Parents' home would not be remedied. Neither Mother nor Father, individually or taken together, have sustained their burden to show that the trial court's determination in this regard was clearly erroneous.

## II. Best Interests of L.P.

[31]     Father also contends that DCS failed to prove by clear and convincing evidence that termination of his parental rights was in L.P.'s best interests. We are mindful that in considering whether termination of one's parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id.* "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007) (citing *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)). "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). In this vein, we have previously determined that the testimony of the case worker or court appointed special advocate ("CASA") regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride*, 798 N.E.2d at 203; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

[32] As outlined above, DCS has demonstrated that Father's domestic violence, alleged physical abuse, and habitual incarceration poses a threat to the wellbeing of the Children. FCM Sparks and CASA John Nickoll testified that they believed that termination of the parent-child relationship and adoption is in the Children's best interest. In addition to the negative evidence supporting removal from Parents, FCM Sparks indicated that since being removed from Parents' care, the Children's behavior and temperament have significantly improved and that the Children are "very comfortable" living with Aunt and Uncle. Tr. p. 287. The Children have lived with Aunt and Uncle for the majority of their lives, Aunt and Uncle are willing to adopt the Children, and the Children have indicated that they want to continue living with Aunt and Uncle. Moreover, FCM Sparks felt that termination was appropriate because Aunt and Uncle's home provided the Children with much-needed stability and permanency compared to the instability and inconsistency of Parents' home.

[33] In challenging the sufficiency of the evidence to support the termination of his parental rights, Father does not specifically challenge the opinions of FCM Sparks or CASA Nickoll. Instead, Father argues that despite moving frequently he always secured housing and that although he was incarcerated and not employed on the day of the evidentiary hearing, he "maintained fairly regular employment." Father's Br. p. 20. Father also argues that he participated in substance abuse programs and therapy, participated in visitations with Children, and passed all drug screens throughout the life of the case. Finally, Father argues that there was only one instance of physical abuse against the

Children which was substantiated by the DCS and that instance was uncorroborated.

[34] However, as stated above, the trial court found that Father was only minimally compliant with therapy, that Father went long periods without visiting Children while not incarcerated, and that Father refused to take five drug screens, resulting in presumptive positives. The trial court also noted that in addition to the single reported instance of physical abuse against the Children, Parents were the subject of multiple police reports regarding allegations of domestic violence and one of Parents' therapists suspected physical abuse after seeing Mother with an unexplained black eye. The trial court, acting as the fact finder, was free to judge witness credibility and believe or not believe the witnesses as it saw fit. *See Thompson*, 804 N.E.2d at 1149; *McClendon*, 671 N.E.2d at 488; *Moore*, 637 N.E.2d at 822.

[35] Father's criminal recidivism and issues with domestic violence create significant uncertainty as to when, if ever, Father would be capable of providing for L.P. In light of the testimony of the service providers, considered with L.P.'s need for consistency and permanency, we conclude that the evidence is sufficient to establish that termination of Father's parental rights is in L.P.'s best interests and the trial court did not err in finding as such. Father's claim to the contrary essentially amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

# III. Father's Due Process Rights

[36] Father also argues that his due process rights were violated because he was not advised of his right to legal counsel pursuant to Indiana Code section 31-34-4-6 at the outset of the CHINS proceeding underlying this case. Section 31-34-4-6 provides that DCS shall inform the parent of a child who is the subject of a CHINS proceeding of his or her statutory rights in writing. The rights as enumerated by the statute include "the right to be represented by a court appointed attorney…upon the request of the parent…if the court finds that the parent" is indigent. Ind. Code § 31-34-4-6(a)(2).

[37] 
> The Due Process Clause of the United States Constitution "prohibits state action that deprives a person of life, liberty, or property without a fair proceeding." *In re B.J.*, 879 N.E.2d 7, 16 (Ind. Ct. App. 2008), *trans. denied*. It is also well settled that the right to raise one's child is an "essential, basic right that is more precious than property rights." *In re C.C.*, 788 N.E.2d 847, 852 (Ind. Ct. App. 2003), *trans. denied*. Thus, when the State seeks to terminate a parent-child relationship, it must do so in a manner that meets the constitutional requirements of the due process clause. *Hite v. Vanderburgh County Office of Family & Children*, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006). Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." *In re J.T.*, 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000), *trans. denied*.

*In re J.S.O.*, 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). When faced with a claim of denial of due process in a CHINS or TPR proceeding, we focus on "the risk of error created by the State's chosen procedure." *Id*. (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). Furthermore, "if the State imparts a due

process right, then it must give that right." *Id.* (citing *A.P. v. Porter County Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied*.

[38] On February 11, 2011, at the initial hearing on the CHINS petition, Mother was informed of her right to counsel which she waived. Father was incarcerated at the time of the initial hearing and although he was served with a summons regarding the CHINS proceeding, the summons did not inform him of his right to counsel. On September 12, 2011, the trial court found Parents to be indigent and appointed counsel to represent them. It is unclear from the record whether Father was informed of his right to counsel by DCS prior to appointment of counsel.

[39] DCS filed its TPR petition on January 31, 2014, and Father was appointed counsel on February 3, 2014. Father concedes that his trial counsel failed to argue that his due process rights were violated in the CHINS proceeding and, as such, waived the issue for review on appeal. However, Father argues that the failure to properly advise him of his right to counsel was a fundamental error[4].

> [I]f the court made a "fundamental error," meaning an error "so prejudicial to the rights of a defendant that a fair trial is rendered impossible," then the lack of objection does not waive the right on appeal. *Wilson v. State*, 931 N.E.2d 914, 919 (Ind. Ct. App. 2010). The fundamental error rule "applies only when the error constitutes a blatant violation of basic principles, the harm or

---

[4] Although the fundamental error rule is typically applied in criminal cases, it has been similarly applied in a TPR case in *Matter of D.G.*, 702 N.E.2d 777, 779 n.2 (Ind. Ct. App. 1998).

> potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id*.

*Beeler v. State*, 959 N.E.2d 828, 830 (Ind. Ct. App. 2011).

[40]   Father claims that counsel would have been particularly helpful at the outset of the CHINS proceeding because the circumstances predicating the CHINS petition involved only Mother's drug use. Although it is true that DCS's initial concerns appeared to consist of only Mother's behavior, it quickly became apparent to DCS that Father also had challenges providing consistent adequate care for the Children as evidenced by the following: Father was incarcerated when DCS became involved and so could not provide for Children at that time; concerns with Father's domestic abuse were an issue as early as March 29, 2011 and the initial home visit was delayed due to these concerns; Father and Mother cohabitated throughout the majority of the CHINS proceedings, and later married, meaning Mother's substance abuse would have posed a threat to Children regardless of Father's ability to provide.

[41]   Therefore, it is unlikely that Father would have prevailed at the CHINS proceeding even if he had been represented by counsel. Furthermore, Parents were appointed counsel in September of 2011 and the TPR petition was not filed until 2014. Father's subsequent failure to comply with recommendations by the trial court and DCS, as well as his continued criminal behavior and incarcerations, are not attributable to a lack of counsel at the outset of the case. We cannot say that the failure to advise Father of his right to counsel—

assuming such an error was made—so fundamentally denied his rights as to make a fair trial impossible.

# Conclusion

[42] Having concluded that the evidence is sufficient to support the trial court's order terminating Parents' parental rights to the Children and that Father's due process rights were not violated, we affirm the judgment of the trial court.

[43] The judgment of the trial court is affirmed.

Baker, J., and Pyle, J., concur.